(No. 37450.— )

VARNUM A. PARISH *et al.*, Appellees, *vs.* W. J. PARISH *et al.*, Appellants.

*Opinion filed Sept. 27, 1963.—Rehearing denied Nov. 25, 1963.*

Eva L. Minor, Wayne P. Dyer, and T. R. Johnston, all of Kankakee, for appellants.

Thomas A. Nutting, and C. M. Granger, both of Kankakee, for appellees.

Mr. Chief Justice Klingbiel delivered the opinion of the court:

Varnum Parish instituted a partition suit in the circuit court of Kankakee County naming Anthony Parish, W. J. Parish (both individually and as executor of the will of Carrie Parish, deceased,) and certain tenants in possession as defendants. W. J. Parish filed a counterclaim against Varnum Parish and Anthony Parish and, in addition thereto, named the Church of the Good Shepherd, Momence, Illinois, as an additional defendant. After prolonged hearings before the chancellor, a decree was entered dismissing the counterclaim and directing partition as requested in the complaint. A freehold being involved, direct appeal has been prosecuted to this court.

Varnum Parish, Anthony Parish, W. J. Parish, and Carrie Parish were the children of W. W. Parish, who owned considerable real estate and the controlling interest in the Parish Bank and Trust Co., in Momence, Illinois. In 1941 W. W. Parish was 86 years old and, contemplating remarriage, he executed a written trust agreement whereby he conveyed to his three sons, as trustees of the W. W. Parish Estate, 11 parcels of real estate and 188 shares of Parish Bank stock, such property being thereafter referred to as the "trust property." Under the terms of the trust

agreement, the trustees were required to manage the property during the lifetime of the settlor and to pay him not more than $10,000 each year. Upon the settlor's death the trustees were directed to sell all the trust property and each was to take one fourth of the proceeds as his absolute property. The remaining one-fourth share was to be invested in an annuity contract payable to Carrie Parish, the type and form of annuity being left to the discretion of the trustees, and upon its purchase the trust was to terminate. It was further provided: "The terms and conditions of this trust may be changed by an agreement in writing signed by the said W. W. Parish and said trustees, provided all of said trustees and said W. W. Parish join in the execution of said agreement. Any property held by said trustees under this trust may be removed from said trust and taken out from under the terms of this trust agreement by an agreement between said trustees and said W. W. Parish."

On the date the trust was created, W. W. Parish also conveyed seven other tracts of real estate to his three sons in their individual names and shortly thereafter made a further gift of $28,000 cash, $7,000 of which was immediately distributed to each son and the remaining $7,000 was used to purchase an annuity for Carrie Parish. For purposes of clarification, the seven real-estate parcels and the cash sum were referred to as the "gift property." In addition to the above conveyance, each of the children was deeded a farm as his or her absolute property, and W. W. Parish also conveyed his homestead to Carrie Parish.

During the settlor's lifetime, W. J. Parish, by common consent, managed the trust and gift properties and kept the records relative to income and expenses. Money arising from the trust property was deposited by him in an account at the Parish Bank bearing the names of the three brothers as trustees, this being referred to as the "trust account," and money received from the gift property was deposited in a separate account bearing the names of V. A. Parish,

W. J. Parish, and Anthony Parish and known as the "gift account." Expenses of the two classes of property were also paid from the respective accounts. Payments were made to the settlor from the trust account and, periodically, distributions were made from the gift account as follows: one fourth to each of the brothers and one fourth to a third account at the Parish Bank, known as the V. A. Parish, W. J. Parish, and Anthony Parish Special Account.

Varnum Parish and Anthony Parish testified that in 1943 the settlor, in the presence of his three sons, stated he was not particular whether an annuity was purchased for Carrie Parish upon the settlor's death so long as she was adequately provided for, and that if she was cared for, the trustees could, if they desired, take all of the property when she died. W. J. Parish denied that any such conversation took place. In any event, the settlor died on October 15, 1944, and on January 6, 1945, the trustees conveyed all of the remaining trust real estate to themselves as individuals. Again there was a sharp conflict in the testimony concerning this act. Varnum Parish and Anthony Parish stated it was done in accordance with the oral statements made by settlor in 1943, but W. J. Parish insisted the conveyance was merely to facilitate the ultimate sale of real estate by eliminating the necessity for separate trustees' deeds and that it was not intended to destroy the interest of Carrie Parish.

On January 6, 1945, the trust account was closed and the balance transferred to the gift account. Thereafter, receipts and expenditures relative to both the trust property and the gift property were reflected in the gift account, and as distributions were made therefrom, one quarter was paid to each of the sons as their absolute property and the remaining one-quarter part was deposited in the V. A. Parish, W. J. Parish, and Anthony Parish Special Account. From time to time the money from the special account was used to pay Carrie Parish's personal expenses, such as her farm

manager's fees, farm rentals, insurance premiums, and income taxes, but in most instances as the money accumulated in this special account it was used to purchase United States bearer bonds, which were in turn placed in a safe deposit box registered in the names of V. A. Parish, W. J. Parish, and A. Parish. The 188 shares of Parish Bank stock were also split into four equal parts, each of the brothers receiving 47 shares as his absolute property, and the remaining 47 shares were issued in the joint names of the three brothers and thereafter placed in the safe deposit box which was registered in the brothers' names.

This arrangement continued until the death of Carrie Parish on November 4, 1955, at which time the bearer government bonds totaled $50,000 in amount. By reason of a stock split, the 47 shares issued in the joint names of Varnum, Anthony, and W. J. Parish had increased to a total of 188 shares; there was then $2276.96 in the special account; and there was approximately $2976.15 in the gift account. In addition, Carrie Parish at her death owned a farm, her home, and industrial stock registered in her own name. She also had a personal account in her own name at the Parish Bank and two or three safe deposit boxes. By her will, Carrie Parish bequeathed all Parish Bank stocks "which I may own at my death" to W. J. Parish; two thirds of all other stocks, bonds, and securities to W. J. Parish and the remaining one-third to Varnum and Anthony, in equal parts; devised her homestead to her three brothers equally; her farm to other named persons; and "all title which testator may own at death in or to the real estate situated west of my home in Momence, Illinois, on which said real estate is situated a bowling alley and other business establishments" to the Church of the Good Shepherd at Momence, Illinois. Originally the trust property had included a city block west of Carrie Parish's house but this had largely been sold prior to her death. Other than this latter provision, the testatrix made no reference to the

trust and gift properties and there was no residuary clause in her will.

The property sought to be partitioned is the remaining trust real estate plus the Carrie Parish homestead which she devised to her brothers. Varnum Parish and Anthony Parish contend that Carrie Parish at no time had any interest in the gift property; that her right to share in the trust assets was eliminated by the alleged oral agreement between the settlor and the trustees in 1943; that thereafter the brothers were obligated only to furnish her adequate care; that Carrie Parish had no right to share in the income or sales proceeds of either the trust or the gift properties; that the United States bearer bonds, bank stocks, gift account, and the special account did not belong to her in whole or in part but belonged to the brothers in equal shares; that the deposits made to the special account, the purchase of government bonds, and the joint issuance of a one-quarter part of the bank stock were solely for the purpose of providing a fund with which to care for Carrie Parish should her personal funds be insufficient to meet her necessities and without any intent thereby to vest any interest in her; and that Carrie Parish had no interest in the trust real estate west of her home which she could devise to the Church of the Good Shepherd.

W. J. Parish, on the other hand, insists that at the time of the original conveyance Carrie Parish was given an undivided one-quarter interest in the gift property, record title to the property being taken solely in the names of the brothers because of Carrie Parish's lack of business experience and the fear that she might otherwise encumber the premises; that there was no oral agreement between the settlor and the trustees in 1943 so that Carrie Parish also owned a one-fourth interest in the trust property at the time of her death; that except for the devise to the Church of the Good Shepherd, all of Carrie Parish's one-fourth

interest in the trust and gift real estate passed as intestate property to her three brothers in equal parts; that the United States bearer bonds, the Parish Bank stock which had been issued in the joint names of the brothers, the special account, and one fourth of the gift account represented income and proceeds from Carrie Parish's undivided interest in the trust and gift properties and belonged to her at the date of her death; and that W. J. Parish, as executor of the last will of Carrie Parish, deceased, is entitled to such personal property as estate assets. The Church of the Good Shepherd, as devisee, claims the parcel of city property lying west of testatrix's residence which was held by the trustees at her death.

Although W. J. Parish insists that Carrie Parish was given an undivided one-quarter interest in the gift property at the time of its conveyance by W. W. Parish to his sons, the circumstances surrounding this transfer indicate to the contrary. Whereas W. W. Parish did on the same date convey other properties to his sons as trustees under a written agreement, the conveyance of the gift property was solely to the sons in their individual names without any indication of trust either in the deed itself or by separate instrument. W. W. Parish was a man of considerable wealth and business experience; W. J. Parish and Varnum Parish were both attorneys; and Anthony Parish was president of the Parish Bank. It is inconceivable that individuals of such experience would carefully prepare a written trust agreement as to certain property and then on the same day accept a conveyance of other property under an oral trust or some similar arrangement. Furthermore, both Varnum Parish and Anthony Parish testified that their sister was at no time to have an interest in the gift property. The chancellor saw and heard the witnesses and was in a better position to adjudge their credibility than is a court of review. Having accepted the latter testimony as correct, the

chancellor's findings in this respect will not now be disturbed. *Evangeloff* v. *Evangeloff*, 403 Ill. 118; *Pure Oil Co.* v. *Byrnes*, 388 Ill. 26.

As originally drawn, the trust agreement provided that upon the settlor's death the trust property should be sold and one fourth of the proceeds paid to each of the three sons. The remaining one-fourth of the sale proceeds was to be "invested by said trustees in the purchase of an annuity contract payable to Carrie M. Parish." Thus, under this arrangement, Carrie Parish did not acquire an interest in the trust real estate as such, but only the right to an annuity contract purchased from the sale proceeds. Therefore, under the doctrine of equitable conversion, her interest was at most personal property and was not subject to a devise, and the Church of the Good Shepherd has no standing in this partition suit. *Brown* v. *Lochridge*, 10 Ill.2d 254; *Wattjes* v. *Faeth*, 379 Ill. 290.

Under its terms, the trust agreement could be changed only by an agreement in writing signed by the settlor and each of the trustees, but property could be removed from the trust "by an agreement" among the settlor and trustees. In contending that the requirement for an annuity purchase was eliminated by the alleged 1943 conversation between the settlor and his sons, Varnum Parish and Anthony Parish argue that, although not in writing as required for a modification of the trust agreement, the oral conversation was in essence a removal of a property interest from the trust which did not have to be in writing. This appears to be a somewhat strained interpretation of the trust terms. By reason of the alleged 1943 conversation, no title to real estate or personal property was revested in the settlor, but at most the provision concerning distribution of the sale proceeds was altered. This was not, in our opinion, a removal of property from the trust nor was it a revocation of the trust since the property continued to be held and managed by the trustees until the settlor's death in

October, 1944. Rather, if we accept the testimony that such a conversation did in fact take place in 1943, it was an attempt by oral agreement to modify the trust terms, which was contrary to the express provisions of the written trust agreement. It is elementary that if the method of exercising a power of modification is described in the trust instrument, the power can be asserted only in that manner. (Bogert, Trusts and Trustees, sec. 993; Restatement of the Law of Trusts, § 331; 54 Am. Jur., Trusts, sec. 69.) The attempted modification, being not in writing, was of no force and effect, and upon the settlor's death the trustees were under a duty to sell the trust property and invest one fourth of the proceeds therefrom in an annuity contract for the benefit of Carrie Parish. In failing to do so, the trustees committed a breach of the trust agreement.

As a result thereof, during her lifetime Carrie Parish could, at her election, have maintained a suit to compel performance of the trust agreement or to charge the trustees with any depreciation of the trust estate, with any profit realized by the trustees through the breach of trust, or with any profit which would have otherwise accrued had the breach not occurred. (Restatement of the Law of Trusts, vol. 1, §§ 199, 205). Having made no such election, this right of action passed at the death of Carrie Parish to her executor. Restatement of the Law of Trusts,, vol. 1, § 200; Bogert, Trusts and Trustees, sec. 871; 19 I.L.P., Executors and Administrators, sec. 76.

By his counterclaim the executor claims a one-fourth interest in the real estate, the 188 shares of bank stock, the bank balances, and $50,500 of government bonds. However, under the terms of the trust agreement, Carrie Parish did not own the trust property as such. Legal title was vested in the three trustees, and was to be liquidated upon the death of the settlor, W. W. Parish, and one-fourth part of the proceeds was to be invested in an annuity for Carrie. Since the annuity was not purchased during Carrie's lifetime, it

150

is too late to do so now. The holders of the legal title to the trust real estate are entitled to its partition, while whatever right the executor has is in the proceeds. He is not entitled to the whole of the bank accounts nor to all the government bonds because the gift funds, in which Carrie held no interest, were commingled with the trust funds. The executor is entitled to one fourth of the net proceeds of sale of the trust property, plus the net income therefrom after deducting the amounts expended for Carrie's account in her lifetime plus one fourth of income and profits realized from reinvestment of principal funds and investment of unexpended income. These amounts cannot be computed from the present record and can be ascertained only by an additional accounting proceeding in the trial court.

Therefore, the decree of the circuit court of Kankakee County is affirmed insofar as it grants a partition of the trust real estate. Its decision to dismiss the counterclaim of W. J. Parish must be reversed, however, and the cause remanded for further proceedings in conformity with this opinion. In view of our findings it is unnecessary to consider other contentions made by the parties.

*Affirmed in part and reversed in part and remanded, with directions.*