DAVID C. DISHER, Plaintiff-Appellant and Cross-Appellee, v. GIAN M. FULGONI *et al.*, Defendants-Appellees and Cross-Appellants.

First District (2nd Division) No. 85—3269

Opinion filed August 25, 1987.—Modified on denial of rehearing October 20, 1987.

2

Gary M. Elden and Gerald F. Lutkus, both of Chicago (Reuben & Proctor, of counsel), for appellant.

William J. Harte, Ltd., and Chadwell & Kayser, Ltd., both of Chicago (William J. Harte, William E. Snyder and Laura B. DiGiantonio, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:
This is the second appeal involving the same parties. The first ap-

4

peal (*Disher v. Fulgoni* (1984), 124 Ill. App. 3d 257, 464 N.E.2d 639, *appeal denied* (1984), 101 Ill. 2d 564), resulted in the reversal of the circuit court's denial of a preliminary injunction by which plaintiff, David C. Disher, sought to nullify or restrain enforceability of an employee confidentiality agreement executed by him while in the employ of Information Resources, Inc. (IRI), formerly known as NEWIRI, Inc., a defendant.

Upon remandment, Disher sought release of stock from a voting trust under the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1981, ch. 121½, par. 137.1 *et seq.*) (Securities Law); attorney fees under the Securities Law; invalidation of his employee confidentiality agreement; and a finding that IRI tortiously interfered with Disher's prospective economic advantage. The circuit court directed defendants to release Disher's stock, but not under the Securities Law, and therefore denied Disher's request for fees under that law. The employee confidentiality agreement was invalidated, and IRI was held to have tortiously interfered with Disher's prospective economic advantage.

The questions raised by Disher in this appeal include whether: (1) the issuance of voting trust certificates constituted a sale under the Securities Law; and (2) the issuance of voting trust certificates was a transaction exempt from registration which would support denial of attorney fees. Alternative issues raised by Disher need not be considered here in view of our decision.

The cross-appeal brought by defendant IRI and individual defendants raises issues as to whether the circuit court erred in (1) failing to bar Disher from asserting the alleged breach, if there was a breach, by his own inaction; (2) ordering the release of all Disher's stock from the voting trust; (3) holding the IRI employee confidentiality agreement invalid and unenforceable; and (4) holding that IRI tortiously interfered with Disher's prospective economic advantage.

Only those facts necessary to the disposition of the present appeal will be repeated or otherwise set forth here; additional facts may be found in our first opinion. (*Disher v. Fulgoni* (1984), 124 Ill. App. 3d 257, 464 N.E.2d 639.) IRI is a marketing research firm which designed, developed and maintained computer-based systems and services for the collection and analysis of market information on sales of packaged consumer goods, thereby assisting manufacturers of consumer goods in the testing and evaluation of their marketing plans for new products, media advertising, pricing and sales promotions.

In August 1981, Disher was offered and accepted employment by IRI at a lower salary than he had previously earned. One of the inducements of employment by IRI was the opportunity to buy IRI

stock through stock option rights. He began employment with IRI as vice-president of operations and directed all market operations of IRI's "BehaviorScan" service,[1] including market fieldwork, data input and in-market quality control.

During the pertinent periods involved, defendant Gian M. Fulgoni was president and chief operating officer of IRI; defendant John L. Malec was chairman of the board and chief executive officer of IRI; and defendant William C. Walter was vice-chairman of the IRI board.

Disher was presented with an employee confidentiality agreement, to which he objected on the grounds of vagueness and overbreadth; however, after he was told that the agreement was a nonnegotiable condition of employment, Disher signed it on January 19, 1982, for fear of losing his job.

In late 1981 or early 1982, IRI wanted to buy out a substantial shareholding in IRI held by Penny Baron, one of its founders. IRI did not have sufficient capital surplus to buy the shares itself. Certain employees, including Disher, were called to a meeting by Malec, who told them that: they could surrender their IRI stock option rights in return for the opportunity to buy twice as many shares of Baron stock; IRI would arrange bank financing for the purchases and would pay interest on the loans for three years; the employees' stock would be placed in an employees' voting trust; and the trust would expire if IRI sold stock to the public or in 1992, unless extended.

Three proposed agreements were given to these employees to sign in early 1982: the "Fulgoni-Employee Agency Agreement"; the "IRI-Employee Agreement"; and the "IRI, Inc. Voting Trust Agreement." The agreements were drafted by IRI's attorney working solely for IRI and not representing the individual employees.

Disher's individual "Fulgoni-Employee Agency Agreement" and "IRI-Employee Agreement," both dated February 19, 1982, ratified IRI president Fulgoni's 1,000-share purchase from Baron as "agent" for Disher, and provided that the shares would be deposited with Fulgoni and Walter as trustees of the voting trust. The consideration specified for the transaction was "mutual promises, covenants and conditions of this Agreement." The Baron stock was purchased on February 23, 1982, and transferred to Fulgoni as agent for Disher and the other selected employees (collectively Disher *et al.*). Fulgoni deposited the shares into the voting trust on March 5, 1982. The above-described agreements were not signed by Disher personally until March 11, 1982.

---

[1]More fully described in the first appeal.

The "IRI-Employee Agreement," dated February 19, 1982, but purporting to be executed simultaneously with the Fulgoni agency agreement, provided that in consideration of IRI's agreement with a bank, sufficient to induce the bank to loan money to IRI employees, and IRI's payment of accrued interest for a three-year period or sale of the stock or voluntary employee termination, Disher *et al.* would apply to the bank for a loan, purchase the Baron stock from Fulgoni under the agency agreement, and immediately deposit the Baron stock they received into a voting trust with Fulgoni and Walter as trustees and Malec as successor trustee. Disher *et al.* would, if necessary, pledge the voting trust certificates as security for any loan used to acquire stock, or the certificates would be held in escrow by IRI to insure that they were not transferred in violation of the agreement. Disher *et al.* would be restricted from selling, transferring or otherwise disposing of the shares or voting trust certificates except pursuant to paragraphs 4, 5 and 6. Paragraph 4 required Disher *et al.* to sell their interest in the stock and voting trust certificates in the event that their employment was terminated under specified circumstances. Paragraph 5 required that Disher *et al.* sell their stock or voting trust certificates to the maker of an offer to purchase all or substantially all the stock of the company, if such offer was accepted by a majority of the company's shareholders. Paragraph 6 provided that if the IRI common stock became publicly traded, Disher *et al.* could sell, transfer or dispose of the shares or voting trust certificates free of all restrictions other than applicable Federal and State securities laws, rules and regulations.

The voting trust agreement, dated March 1, 1982, required Baron's IRI stock certificates to be registered in the names of the trustees, who then issued voting trust certificates to the participating employees. This agreement gave the trustees the right to exercise the certificate holder's rights, including the right to vote for IRI directors, or for or against any action or resolution, merger or sale of substantially all IRI assets. The voting trust agreement provided further that the trust would continue until March 1, 1992, but would terminate at any time upon the execution by the trustees of a deed of termination. Further, the trust could be terminated at the option of the holders of a majority of the voting trust certificates at any time after the company became publicly held.

Meanwhile, in April 1982 Disher was promoted to senior vice-president of IRI and, in lieu of a raise, was given and accepted the right to purchase 500 more shares of Baron stock under the same agreements previously described and signed by him.

The trustees did not register the voting trust certificates under the Securities Law, nor were Disher *et al.* given a statutorily required prospectus explaining in clear, concise and understandable fashion (1A Blue Sky L. Rep. (CCH) par. 22,658 (1986)) the length of time the securities would remain in trust, how the voting trust could be extended, or how the voting trust could be amended. See 17 C.F.R. sec. 239.25, item 4 (1986).

IRI began selling its stock to the public on March 4, 1983. On April 6, 1983, Disher was fired. Disher was told he could use the company's offices for 90 days in order to assist his transition to another job. Disher was first advised of IRI's preference that he not work for the Burke Companies; later, this was expanded to include other companies as well, including the A. C. Nielsen Company. Disher inquired about obtaining the release of some or all his stock in trust; IRI did not overtly object, but sent him a "letter-agreement" which provided that he now sign a limited noncompetition agreement, in addition to his previous confidentiality agreement, and IRI then would attempt to facilitate the private placement of trust certificates representing 15,000 shares among other existing certificate holders at a price Disher set at $22 per share and would use its best efforts to persuade all the certificate holders to allow the remaining 7,500 shares to be withdrawn from the voting trust on July 1, 1985. IRI acknowledged that it had no legal right to terminate the voting trust but, in consideration of the limited noncompetition agreement, it would use its best efforts including, if necessary, the guarantee of loans to certificate holders for purposes of purchasing Disher's certificates, and to obtain the agreement of all the other voting trust certificate holders and trustees to this procedure. Disher declined to sign the agreement.

Disher sought employment with other firms and, after two interviews with the A. C. Nielsen Company, was offered a position there as field operations manager. A letter was sent by IRI's legal counsel apprising A. C. Nielsen's general counsel of the existence and nature of the confidentiality agreement signed by Disher in 1982. The IRI letter declared that IRI would enforce and maintain to the fullest extent its proprietary rights under the agreement. The offer was renewed, contingent upon Disher's receiving a declaratory judgment or injunction restraining enforcement of his employee confidentiality agreement with IRI by October 15, 1983. Disher thereafter filed a motion for a preliminary injunction, it was denied, he sought and received an interlocutory appeal, and this court reversed the denial and remanded the action.

On July 28, 1983, after earlier receiving an Illinois Secretary of

8

State certificate confirming the trustees' failure to register the voting trust certificates, Disher gave notice of his desire to void and rescind the issuance of the certificates pursuant to the Securities Law. The notice stated that he was rescinding only the voting trust certificates, not the IRI common stock issued or sold. In admitted "retaliation," defendants sent Disher letters inferentially threatening forfeiture of Disher's entire stock holdings, having an estimated value of over $1 million, with return of the purchase price of the shares, about $18,000, unless he dropped his claim.

Disher filed suit. In his amended verified complaint filed August 16, 1983, he asserted, among other things: (a) defendants failed to comply with the Securities Law by not registering the voting trust certificates; (b) his contract with IRI clearly entitled him to sell the stock when IRI went public and that, in any event, if the contract was ambiguous, those ambiguities had to be construed against IRI as the draftsman; (c) IRI officials acting as fiduciaries breached their duties by not clearly explaining ambiguities and complex terms to him; (d) the trustees violated their duties of loyalty and even-handedness; and (e) the voting trust agreements, as construed by IRI, rendered the entire voting trust apparatus an unreasonable restraint upon alienation.

A verified answer to Disher's complaint and a verified counterclaim were filed by defendants, and Disher filed his verified answer to the counterclaim. The counterclaim sought, among other things: (a) a preliminary and a permanent injunction restraining Disher from disclosing or using IRI's trade secrets or proprietary information; and (b) a declaration of whether Disher had the right to rescind his agreements with IRI and the trust.

On November 15, 1983, Walter and Fulgoni, as trustees of the voting trust, issued a memorandum to the participants in the trust, except Disher, proposing its early termination. The stock would be withdrawn and distributed to the participants on an annual basis, beginning in 1984 and concluding in 1990. Disher did not learn of the foregoing modification until 1984.

After hearing evidence and argument in October 1983, October 1984, and March 1985, the circuit court found on August 12, 1985, that: (1) defendants violated no duty to Disher in relation to his purchase of IRI stock, the formation of the voting trust, or the deposit of his stock in the trust; (2) defendants were not contractually obligated to release IRI stock from the voting trust; (3) the voting trusts were not oppressive and were valid; (4) the IRI employee confidentiality agreement was invalid and unenforceable, and IRI interfered with Disher's prospective economic advantage in the A. C. Nielsen matter;

(5) the voting trust certificates were securities and their exchange for Disher's stock constituted a sale; however, the sale was exempt from the registration requirements of the Securities Law and Disher therefore had no right to rescind his deposit of stock into the voting trust or to receive attorney fees; and (6) the trustees breached their fiduciary duties to Disher by amending the trust after Disher's suit was filed without giving notice to Disher or including him in the initial partial distribution under the amendment. The court ordered that all Disher's IRI stock be removed from the trust and delivered to him.

Disher appeals and defendants cross-appeal, as first above noted.

I

 The first issue to be addressed in this appeal is whether the issuance of voting trust certificates in exchange for the placing of the IRI stock into the voting trust constituted a sale of securities under the Securities Law.

IRI maintains that although the voting trust certificates were among the types of instruments included in the definition of "security" in section 2.1 of the Securities Law, it does not follow that the issuance of the same to Disher constituted the "sale of a security" under section 2.5 of the Law. (Ill. Rev. Stat. 1981, ch. 121½, pars. 137.2—1, 137.2—5.)[2] IRI asserts that an economic reality approach should have been applied to determine whether a sale of securities under State and Federal securities laws can be considered to have taken place and relies on Federal district court cases for this determination. *McCloskey v. McCloskey* (E.D. Pa. 1978), 450 F. Supp. 991; *Watts v. Des Moines Register & Tribune* (S.D. Ia. 1981), 525 F. Supp. 1311.[3]

A "sale," under section 2.5 of the Securities Law, "shall include every *disposition* \*\*\* *of a security* for value" and "shall also include a contract to sell, an exchange, an attempt or an offer to sell, an option of sale or a solicitation of an offer to buy, directly or indirectly." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—5.) The definition of a sale under our Securities Law is itself liberal; its purpose has been held to include every transaction which reasonably could be regarded as a sale. (*Benjamin v. Cablevision Programming*

---

[2]The definitions set forth in sections 2.1 and 2.5 were since amended by Public Act 83—44 (eff. Jan. 1, 1984).

[3]*Nemkov v. O'Hare Chicago Corp.* (N.D. Ill. 1978), No. 77 C 4714, and *Greater Iowa Corp. v. McLendon* (8th Cir. 1967), 378 F.2d 783, cited by defendants in support of their theory, purport to hold that a pledge of stock is not a sale; however, in *Rubin v. United States* (1981), 449 U.S. 424, 66 L. Ed. 2d 633, 101 S. Ct. 698, the United States Supreme Court held to the contrary.

*Investments* (1986), 114 Ill. 2d 150, 161-62, 499 N.E.2d 1309; *Silverman v. Chicago Ramada Inn, Inc.* (1965), 63 Ill. App. 2d 96, 101, 211 N.E.2d 596.) The instant transaction, the "disposition" of the IRI stock for the trust certificates, clearly was a sale within the contemplation of our Securities Law.

The circuit court here considered whether the security had the "same value" as the stock for which, in part, it was deposited and whether any interest was "transformed in any real sense." Fully supported by record evidence, the court found that the trust certificates were not of the same value but were worth substantially less than the IRI stock; therefore, the court held, the stock was transformed in a real sense and the certificate issuance was deemed a sale of a security. The test of "transformation in any real sense" tracks the economic substance test articulated in the Federal cases of *McCloskey* and *Watts.* The economic substance, or economic reality, test has been limited, however, in *Landreth Timber Co. v. Landreth* (1985), 471 U.S. 681, 85 L. Ed. 2d 692, 105 S. Ct. 2297, where the United States Supreme Court stated that such a test is applicable only if the instrument involved is "unusual" and cannot be "easily characterized" as a security (471 U.S. 681, 690-91, 85 L. Ed. 2d 692, 700-01, 105 S. Ct. 2297, 2304-05), and did not fall within the statutory definition (471 U.S. 681, 691-92, 85 L. Ed. 2d 692, 700-01, 105 S. Ct. 2297, 2305). In the instant case, as defendants concede, voting trust certificates expressly fall within the definition of a security. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.2—1.) Additionally, Federal agency opinion and other Federal cases directly on point have held that exchanges of voting trust certificates for stock constituted sales of securities, which allowed the purchasers to rescind under relevant circumstances. *Securities Act Release No. 97* (Dec. 28, 1933); *Corporation Trust Co. v. Logan* (D. Del. 1943), 52 F. Supp. 999, 1003-04; *Kinsey v. Knapp* (E.D. Mich. 1957), 154 F. Supp. 263, 268-69, *vacated on other grounds* (6th Cir. 1957), 249 F.2d 797, *cert. denied* (1958), 356 U.S. 936, 2 L. Ed. 2d 812, 78 S. Ct. 778.

The circuit court here correctly found that the issuance of voting trust certificates in exchange for IRI stock constituted a sale of securities, but should have so found directly under section 2.5 of the Securities Law.

## II

▮ Disher next urges that his purchase of the unregistered voting trust certificates, through the exchange of his IRI stock for those certificates, was a voidable transaction since the issuance of the un-

registered certificates was a violation of the Securities Law and statutorily voidable upon election of the purchaser.

In Illinois, all securities must be registered before they are offered for sale or sold, unless exempted by various provisions of the Securities Law. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.5.) An underwriter's or issuer's violation of the registration requirements entitles a purchaser to rescind the transaction and to receive reimbursement of attorney fees, among other remedies. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13.) Although the circuit court held that the issuance of voting trust certificates to Disher constituted the sale of a security, it further found the issuance exempt from registration under sections 4M and 4B of the Securities Law (Ill. Rev. Stat. 1981, ch. 121½, pars. 137.4M, 137.4B); the court concluded, therefore, that Disher had no right to rescind his deposit of IRI stock into the voting trust or to secure attorney fees.

Sections 4M and 4B in 1981[4] exempted from registration certain securities transactions only if *"no commission or other remuneration is paid *** directly or indirectly for or on account of such sale *** or issuance."* (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 121½, pars. 137.4M, 137.4B.) Under Blue Sky Regulation 248, remuneration was considered paid only when: (1) commissions or discounts were paid directly or indirectly to any person, including an underwriter or dealer, by the issuer on account of such sale, or (2) when anything of value was paid to or for the benefit of an underwriter or dealer. A statutory underwriter need not be a professional underwriter. (*SEC v. Chinese Consolidated Benevolent Association, Inc.* (2d Cir. 1941), 120 F.2d 738, 740-41, *cert. denied* (1941), 314 U.S. 618, 86 L. Ed. 497, 62 S. Ct. 106; *Cobb v. Uplands Hardware Corp.* (1966), 68 Ill. App. 2d 158, 163-65, 215 N.E.2d 298.) The circuit court here ruled that the consideration paid was in relation to Disher's purchase of stock from Baron, rather than the deposit of stock into the voting trust and the trustee's issuance of trust certificates to Disher. Therefore, the court held, section 4M and section 4B exemptions applied.

Disher contends, however, that IRI received remuneration in connection with the transaction by virtue of its having arranged, negotiated, promoted and helped to finance the exchange of IRI stock for voting trust certificates. Therefore, his argument proceeds, IRI was a statutory underwriter, subject to Illinois Blue Sky Regulation 248, now Regulation 130.250 (1A Blue Sky L. Rep. (CCH) par. 22,660

---

[4]Sections 4M and 4B have since been amended by Pub. Act 83—44, (eff. Jan. 1, 1984).

(1984); 1A Blue Sky L. Rep. (CCH) par. 22,630 (1986)), because it received "remuneration" within the meaning of the Securities Law and neither exemption applied. We agree. IRI itself received both direct and indirect remuneration for and on account of the sale of the voting trust certificates and acted as an underwriter in this instance.

Substantial contractual rights possessed by Disher *et al.* passed to IRI when the employees returned and waived their stock option rights in accordance with the "IRI-Employee Agreement," thereby transferring economic advantages to IRI. Important among these advantages was the avoidance of dilution of shares by liquidating potential stock option purchases held by existing shareholders. Further, the arrangement prescribed by the IRI employee agreement demonstrates additional exchanges of consideration to IRI's advantage, including: that in exchange for IRI's services in arranging for bank financing of the employees' purchase of Baron stock, and its paying the interest thereon for three years, the employees deposited their IRI stock into the voting trust; the employees agreed to a "put and call" sales arrangement between IRI and the bank, which was admittedly to the advantage of IRI and precluded stock from being sold to an outsider, and permitted IRI to retrieve the stock if an employee defaulted on his or her loan; the pledge of employees' voting trust certificates or their delivery to the trustees to be held in escrow by IRI; the employees' acceptance of restrictive conditions on the sale of their certificates; the employees' agreement to sell their interests to the purchaser of all or substantially all IRI shares; and the employees' promises not to transfer their holdings until IRI shares were publicly traded or the trust terminated.

Further, the trust arrangement gave the trustees, who were among the highest level management personnel of IRI and were major IRI shareholders, the right to exercise certain powers inhering to the advantage of IRI, without notice to or consent by Disher *et al.*, the trust beneficiaries, including the power to sell the employees' stock under certain conditions; to consent to major corporate changes, including the sale of all assets, and to vote for, approve and consent to, or abstain from voting upon (but not vote against) any IRI plan of merger or consolidation. At the very least, placement of the stock in the trust gave IRI indirect, if not direct, control of all purchases as well as the power of disposition of that stock.

Defendants contend that any such remuneration must have involved payment by the issuer of a security, here the voting trust, to an underwriter or dealer, which payment is absent under the instant facts. That analysis applies only to the first section of Blue Sky Reg-

ulation 248. Defendants' argument ignores the second section, which applies here and required only that the securities or contracts or anything else of value which was set aside, disposed of or made in connection with the sale of the security, benefit the underwriter, in order to be deemed remuneration under the Securities Law. IRI, although not directly involved in the exchange of stock for voting trust certificates, was a third party which benefitted in a variety of ways from the transaction between Disher *et al.* and the voting trust.

Blue Sky Regulation 248(2) included within the concept of remuneration securities or anything of value which may be disposed of by the underwriter, as well as benefits from any understanding, clearly the case here, since the above-noted exchanges of consideration are ineluctably related to the voting trust certificate transaction. IRI obtained benefits for itself through its role in orchestrating the entire transaction, including arranging the requisite financing. It caused the drafting of the voting trust and related instruments, solicited Disher *et al.* to participate in the plan and to deposit their stock in the trust and surrender their stock option rights, and nominated as trustees members of its own highest level management team. Through the trust then, IRI obtained the rights it sought and imposed upon itself obligations which resulted in consummation of the entire transaction. The issuance of the voting trust certificates is identified in the "IRI-Employee Agreement" as the consideration to be given the employees not only for relinquishing the stock, but also in exchange for the considerable powers delegated to the trustees which could be exercised to IRI's benefit. From the foregoing, it is clear that IRI was "paid" by Disher *et al.* with obvious contractual and economic benefits and thereby acted as a statutory underwriter for these transactions. See *SEC v. Chinese Consolidated Benevolent Association, Inc.* (2d Cir. 1941), 120 F.2d 738, 741.

Remuneration for issuance of voting trust certificates therefore was received by IRI here through the litany of benefits it secured under Blue Sky Regulation 248(2), and the exemptions provided by sections 4M and 4B are inapplicable. The circuit court's ruling to the contrary must be reversed and the cause remanded for the purpose of ascertaining the extent of remedial relief to which Disher is entitled under section 13 of the Securities Law (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13).

### III

On cross-appeal, defendants perceive error in the circuit court

finding that the trustees breached their duty by failing to include Disher in a partial distribution of stock from the trust and in the court's directing that all his IRI stock be released from the voting trust.

In November 1983, after Disher filed his initial complaint and sought to rescind the voting trust agreement, the two voting trust trustees and other participants voted to amend the voting trust agreement by creating an early scheduled distribution of IRI stock. The participants did so without notice to or consent of Disher. The first early distribution took place on January 15, 1984. After trial, the circuit court concluded that the voting trust agreement was thereby improperly amended because there was no express right to modify the trust retained in the agreement and modification could have been accomplished only by unanimous voting by all participants. The court held that since Disher was not notified and did not consent to the modification, the modification was improper, the trustees violated their fiduciary duties to Disher and, as a remedy, the court ordered the release to Disher of all his IRI stock held by the voting trust. Defendants claim that the circuit court's analysis was flawed, based upon the language of paragraph 10.3 of the voting trust agreement and trust law principles.

■■ ■ Paragraphs 10.2 and 10.3 authorized a release of stock from the voting trust only through termination of the trust; an attempted amendment, however, rather than termination, without consent of all the beneficiaries is ineffective. (*Croslow v. Croslow* (1976), 38 Ill. App. 3d 373, 377, 347 N.E.2d 800, *appeal denied* (1976), 63 Ill. 2d 555; *In re Strobel's Trust* (1959), 18 Misc. 2d 145, ____, 188 N.Y.S.2d 273, 277; *Security Trust Co. v. Spruance* (1934), 20 Del. Ch. 195, 202-03, 174 A. 285, 288. See also Restatement (Second) of Trusts sec. 337 (1959).) Where all the beneficiaries of a trust, of whom none is under legal incapacity, consent to the termination of a trust, that result can be accomplished, unless the material purposes of the trust require its continuance. (Restatement (Second) of Trusts sec. 338 (1959).) One or more of the beneficiaries, with the consent of the settlor, can compel a modification, but only if the interests of the beneficiaries who do not consent suffer no prejudice by virtue of that action. (*Botzum v. Havana National Bank* (1937), 367 Ill. 539, 542-43, 12 N.E.2d 203; *Mortimer v. Mortimer* (1972), 6 Ill. App. 3d 217, 222, 285 N.E.2d 542; *Fenske v. Equitable Life Assurance Society* (1950), 340 Ill. App. 58, 62, 91 N.E.2d 465. See also 4 A. Scott, The Law of Trusts sec. 337, at 2655 (3d ed. 1967); Restatement (Second) of Trusts sec. 338 (1959).) Of course, had there been reserved in

the instant voting trust agreement the express power to modify or alter the trust, that result could have been accomplished by modification in the prescribed manner. (*Parish v. Parish* (1963), 29 Ill. 2d 141, 149, 193 N.E.2d 761; *Northwestern University v. McLoraine* (1982), 108 Ill. App. 3d 310, 317, 438 N.E.2d 1369, *appeal denied* (1982), 92 Ill. 2d 568.) In the present case, no express power to modify was reserved in the voting trust instrument and Disher did not consent to the proposed amendment. Therefore, the putative modification in his absence was ineffective.

Defendants were fiduciaries in acting as trustees of the voting trust. Disher was the only beneficiary omitted from consultation and voting in amending the trust and from the early stock distribution. The circuit court here correctly concluded that in treating Disher in this manner, the trustees breached their fiduciary obligations of loyalty and impartiality to their beneficiaries. *Home Federal Savings & Loan Association v. Zarkin* (1982), 89 Ill. 2d 232, 238-39, 432 N.E.2d 841; *Flynn v. La Salle National Bank* (1956), 9 Ill. 2d 129, 139, 137 N.E.2d 71. See also 2A A. Scott, The Law of Trusts secs. 170, 183, at 311, 557 (4th ed. 1987); Restatement (Second) of Trusts secs. 170, 183 (1959).

Defendants assert that the trustees did not act improperly in delaying the distribution of stock to Disher because of the pending litigation; however, Disher complains principally of amendment to the trust without notice to him or his consent.

The asserted good faith which defendants claim in justification of their action was no doubt weighed against evidence to the contrary by the circuit court. The record reveals defendants' concern that other beneficiaries also might learn of their rights to rescind under the Securities Law. Defendants met to discuss forfeiture of Disher's stock in retaliation for his having asserted a claim and the distribution of that stock back to IRI or to "loyal" IRI employees. Defendants advised Disher in writing that they were empowered to return the purchase price of his stock, forfeit his shares, and designate another purchaser; they began planning the questioned amendment and partial distribution within the same month. When the preliminary injunction hearing resulted in denial in mid-October 1983, defendants sent a memorandum to other participants in the voting trust, predicting that Disher would be put to three to six years of further litigation and that he would not receive his stock because of the litigation he had instituted. The foregoing was accomplished by defendants just before the six-month period for asserting rescission claims expired under the Securities Law.

16

From the foregoing, the record demonstrates sufficient support for the circuit court's conclusion that defendants had breached their fiduciary responsibilities to Disher.

Defendants cite *Dorman v. Central National Bank* (1981), 97 Ill. App. 3d 429, 422 N.E.2d 1019, for the proposition that absent a contrary intention in a trust agreement, a general power to terminate or revoke a trust in its entirety will be deemed to include a power to modify. They argue that since the majority of the beneficiaries here could properly vote to end the trust, they also had the power to amend the trust. The appellate court in *Dorman* did not hold, however, that fewer than all beneficiaries would be permitted to amend the trust where, as here, a beneficiary not notified or permitted to vote subsequently objects to the amendment.

Defendants nevertheless insist that even if Disher had a cause of action against the trustees, he is barred from asserting such a claim by his own inaction. They argue that the amendment to the voting trust was proposed almost four months after Disher's purported rescission of his deposit of IRI stock into the trust and filing the present action. Further, it is claimed, Disher did not request inclusion in the partial distribution which followed until nine months after he became aware of it. Defendants also contend that Disher did not amend his complaint challenging the amendment until after the circuit court announced its rulings at the end of 1984 and in 1985. The foregoing is said to constitute waiver, acquiescence and estoppel, which bar Disher from succeeding with this action.

■■ The record reveals, however, that formal notice of the amendment first was given to Disher in May of 1984. Thereafter, in June 1984, Disher sought by motion to withdraw certain damage claims from the present circuit court case, so that they could be tried in the pending parallel Federal district court case (Disher v. Information Resources, Inc. (N.D. Ill. 1983), 83 C 6964), in which certain remedies, exclusive to Federal court jurisdiction, were sought. The circuit court, in its agreed order, permitted Disher to rely upon facts which had occurred since the filing of the present State court claim (1983), including the then recent action taken relative to the voting trust, without the need to file further pleadings concerning them. Disher thereafter, in July 1984, proceeded to amend his Federal court complaint by including allegations that defendants breached their fiduciary duties to Disher by allowing all holders of voting trust certificates, except Disher, to exchange them for IRI stock in early 1984. That amended complaint was filed in the circuit court and has been made a part of the record in this appeal. Defendants' assertions

of Disher's waiver, acquiescence and estoppel are therefore without support.

■■ Ordering release of Disher's stock from the voting trust as a remedy for the improper amendment is next declared by defendants to have been error committed by the circuit court. Whatever remedy may have been appropriate, defendants argue, rescission of the trust was not. Disher claims, and defendants do not deny, that this issue is moot since the voting trust again has been modified and is to terminate in 1987. Assuming, *arguendo*, that this aspect of relief was improvidently granted by the circuit court, reversal on this point would be inefficacious. *In re Estate of Lawson* (1976), 41 Ill. App. 3d 37, 40, 353 N.E.2d 345. See also *Dobbs v. Chase* (1981), 94 Ill. App. 3d 177, 180, 418 N.E.2d 919, *appeal denied* (1981), 85 Ill. 2d 564.

## IV

Noting that this court's opinion in the first appeal did not purport to resolve finally the merits of the dispute because not all the evidence had been presented to the circuit court, defendants maintain that Disher merely raised a "fair question" in the first appeal with respect to the IRI employee confidentiality agreement and that the circuit court's final ruling that the agreement was invalid, in light of the record after a full trial of this cause upon remandment, was in error and must be reversed.

■■ A substantial amount of discovery was undertaken in this case following remandment and considerable trial evidence was presented to the circuit court, which found the confidentiality agreement overly broad and defendants' conduct in connection therewith inequitable. Evidence was taken with respect to each general area of asserted confidentiality set forth in the agreement, including: the computer programs and systems, panel household identifications, panel matching routines, television converter lists, television converter specifications, test designs, analytical models, and client lists. The evidence taken with respect to the foregoing areas of inquiry supports the conclusion that the IRI employee confidentiality agreement was overly broad, invalid and unenforceable, although in some instances the circuit court found that IRI had a proprietary interest in certain information.

With respect to the computer programs and systems, two principals employed by IRI's main competitors testified that they considered the only confidential information in the industry to be in the area of computer software and electronic technology. Disher, however, was assigned neither a computer access code number nor a

user password, both of which were required to secure information from the IRI computer. He had no training in the use of computers and possessed no technical information concerning the scanners used to monitor consumer transactions. According to one witness, based upon Disher's background, he could not have possessed confidential information requiring protection about computer programs and systems.

With regard to panel household identifications, the circuit court held that after the tests had been completed, there was no reason why the information gleaned therefrom could not be divulged within a reasonable time limit. The panel household identifications consisted of more than 20,000 panel lists in 1985, with plans to have more than 35,000 by the end of 1986. There was a turnover rate of from 12% to 13% per year. Disher testified that he never had any of this information and there was no evidence to the contrary. Defendants presented little, if any, substantive evidence that IRI took adequate security measures to protect this and other confidential information.

Concerning panel matching routines, Disher had no background in statistics or mathematics and knew nothing about the routines which employed marketing and statistical knowledge. Nor was he shown to have knowledge of the converter lists, which contained the identities of households possessing IRI converters for their television sets. Disher did not understand the engineering or technical aspects of the converter specifications, possessing, instead, only a general idea of how the converters were used.

Disher's evidence shows that he was not involved in IRI test design formation, was not consulted about designing tests, and possessed no testing information unique to IRI. He knew the prices and names of products and where and how they were to go on the shelves, but was not aware of clients' advertising budgets.

Methodologies, in which products can be tested in the market research business, are in the public domain according to the evidence. IRI revealed certain testing methodologies when it released to a leading national business school, for publication, extensive cost and financial data involved in IRI testing of one of its products. Without training in mathematics or statistics, an employee would not be familiar with analyzing and projecting data received from the stores; Disher, as noted above, had no training either in mathematics or statistics. Until the lawsuit began, Disher was not familiar with analytical models.

With respect to client lists, IRI asserted that its client lists were confidential. Nevertheless, the Federal district court found, in the

parallel Federal case when granting a motion for summary judgment, that "[d]ue to IRI's repeated exposure in industry publications, its customer base was well known within the marketing research field." IRI's BehaviorScan customers met two tests: they sold consumer package goods in groceries and they advertised on television. There were probably no more than 150 companies that had the research demands and financial resources for a BehaviorScan test. Disher first started market input by making a client list prepared merely by walking through retail stores and writing down the names of manufacturers from boxes and cans on the shelves. In addition, IRI distributed to the public its prospectus in March 1983, which disclosed the names of IRI's 10 largest clients, accounting for some 60% of its revenues, and two other clients, accounting for almost 11% of IRI's 1982 revenues. No other client accounted for more than 10% of IRI's revenues. Although it does not dictate the status of IRI's customer lists, one of IRI's principal competitors publishes its own client list on the back page of the company brochure, which is available to the public. As of 1983, that competitor's customer list included at least 58 past and present IRI clients. Another marketing research firm, according to the evidence, has a substantial overlap with IRI's client list, amounting to as much as 90%, according to an IRI executive.

Other evidence disclosed continuing revelations of IRI's clients' products and test results in various places, including publications approved by IRI, lawsuits in which no protective orders were entered, and even displays in a trophy case located in IRI's building lobby which disclosed products that IRI was currently testing or made by clients for which IRI was working.

Two monographs resulting from extensive case studies on IRI's BehaviorScan test of a certain product set forth in detail how IRI plans and conducts BehaviorScan tests. The documents were published and specifically related in detail the test results.

■■ With respect to financial data, the circuit court in the present case held that this was too broad a category in order to identify the financial data considered confidential. When IRI decided to trade its shares publicly it was required to include considerable financial information in its public disclosure via the prospectus issued in anticipation of public sale. This included operating expenses, selling, general and administrative expenses, interest and other expenses as percentages of revenue, expenditures for anticipating marketing efforts and other detailed information. Other financial disclosures were made in IRI's marketing fact book, which set forth detailed information concerning its marketing operations. Still other financial infor-

mation was published in major financial magazines and newspapers, much of which was given to the media by IRI for publicity purposes. Widespread advertising and publication of such financial information undermines any right to secrecy which otherwise might have existed. (*Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 264, 256 N.E.2d 357, *appeal denied* (1970), 44 Ill. 2d 583.) In any event, that an employee may possess knowledge of the inner workings of a company does not authorize holding that employee hostage to his employer by unnecessarily obstructing his or her reemployment with a competitor. *Reed, Roberts Associates, Inc. v. Strauman* (1976), 40 N.Y.2d 303, 309, 353 N.E.2d 590, 594, 386 N.Y.S.2d 677, 680-81; *Data Communication, Inc. v. Dirmeyer* (E.D.N.Y. 1981), 514 F. Supp. 26, 33.

Future marketing and business plans were shared with competitors by officers of IRI in an early effort to secure financing to begin its own programs. Defendants justify these disclosures by asserting that the competitors were to hold such information in strict confidence. The IRI prospectus disclosed plans of the company to open minimarkets in various specified places and to develop computer programming in different described locations around the country. Other allegedly confidential financial information was revealed by IRI in varieties of ways which need not be further detailed here.

Significantly, IRI hired many of its own top executives away from its competitors. These executives brought with them numbers of trained employees from various companies in competition with IRI. The requirements for confidentiality agreements, if any, among these executives were inconsistent. For example, when Fulgoni joined IRI, he was not required to sign a confidentiality agreement, only a limited one-year noncompetition covenant. Disher *et al.* signed the employee confidentiality agreement at a time when neither IRI executive Malec nor Walter was required to sign one and did not do so until after Disher was fired in 1983. Members of IRI's board of directors were not required to sign a confidentiality agreement up to the time of the circuit court's conclusion of this case.

As previously noted, one damage claim was removed to the Federal district court for trial simultaneously with certain exclusive Federal jurisdiction claims by agreed order in Disher v. Information Resources, Inc. (N.D. Ill. 1983), 83 C 6964. Defendants filed a counterclaim for damages in that case, in which the Federal district court granted Disher summary judgment. The district court there noted that with respect to one of IRI's counterclaims relating to confidential information, "the vast majority, if not all, of the information

allegedly utilized by Disher in the preparation of his business plan was not confidential"; that IRI as a publicly held corporation "included a great deal of its financial information in its public disclosures"; and that because IRI repeatedly exposed information in industry publications, "its customer base was well known within the marketing research field."

The foregoing litany of facts and circumstances substantiates and supports the premise of our conclusion in the first appeal that the confidentiality agreement was overly broad, contained undefined restrictions and was without reasonable relation to the orderly operation of the business of the corporate defendant, which led to the conclusion that Disher had evinced a reasonable likelihood of success on the merits of the case. (*Disher v. Fulgoni* (1984), 124 Ill. App. 3d 257, 263-64, 464 N.E.2d 639.) Further, the above-described circumstances clearly support the circuit court's conclusion that a number of the items were neither confidential nor trade secrets. Contrary to defendants' reading of our earlier opinion as having been confined to temporal and spatial considerations, we also said (124 Ill. App. 3d 257, 263, 464 N.E.2d 639):

> "The *subject matter of his obligation of confidentiality* was explicitly left open-ended. *Taken together*, these terms further highlight the probability that plaintiff is entitled to have the Agreement declared null and void. Under no circumstances can we find that *such broad, undefined restrictions* had any reasonable relation to the orderly operation of the business of the corporate defendant joined in this action." (Emphasis added.)

In any event, even if it had been limited to time and place considerations, our opinion in the first appeal was supported in law. The supreme court's opinion in *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 132 N.E. 806, is instructive in this regard. That court had before it the issue of overbreadth in a confidentiality agreement and held, among other things, that the agreement there involved was overly broad and was in restraint of trade because, without limit as to time or place, it prohibited the employee from giving directly or indirectly any information to any person in regard to the plant or its processes which might injure, by competition or otherwise, the business there involved. (299 Ill. 532, 551, 132 N.E. 806.)

At trial, IRI was unable to show injury to its legitimate business interests which required the broad guarantee of confidentiality which it sought from Disher. (See Robison, *The Confidence Game: An Approach to the Law About Trade Secrets* 25 Ariz. L. Rev. 347, 383-85

(1983). See also *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532; *Iroquois Industries Corp. v. Popik* (1980), 91 Ill. App. 3d 505, 415 N.E.2d 4; *Nationwide Advertising Service, Inc. v. Kolar* (1975), 28 Ill. App. 3d 671, 329 N.E.2d 300; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719; *Nasco, Inc. v. Gimbert* (1977), 239 Ga. 675, 238 S.E.2d 368; *Abramson v. Blackman* (1960), 340 Mass. 714, 166 N.E.2d 729; *Dynamics Research Corp. v. Analytic Sciences Corp.* (1980), 9 Mass. App. Ct. 254, 400 N.E.2d 1274.) Defendant's reliance upon *World Wide Pharmacal Distributing Co. v. Kolkey* (1955), 5 Ill. App. 2d 201, 125 N.E.2d 309, *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795, and *Lawter International, Inc. v. Carroll* (1983), 116 Ill. App. 3d 717, 451 N.E.2d 1338, is misplaced. In none of the foregoing authorities was the topical overbreadth of a confidentiality agreement raised or discussed.

It is observed and maintained by defendants that only confidential information and trade secrets were intended to be protected by the agreement in question, not all information falling within the categories therein set forth, and that only some of the information possessed by Disher was intended to be kept inviolate, thereby leaving Disher free to seek employment elsewhere so long as he did not divulge that information considered confidential. It has taken thousands of pages of testimony and hundreds of exhibits during the course of numerous depositions, a preliminary hearing and two trials to attempt an identification of such information as IRI may legitimately deem confidential and proprietary subject to the agreement. One restricted by such a broad agreement cannot reasonably be expected to pick his or her way across such intellectual land mines without inadvertently setting off one or more. The difficulty with such mental gymnastics was recognized in one of defendant's letters to Disher after he was fired, in which he was advised that in the IRI executive committee's view, it would be "impossible" for him to work for any of IRI's principal competitors in the "near term." This position was set forth in a proposed "letter agreement," articulated by Fulgoni and sent to Disher at the time the parties were negotiating over the release of Disher's voting trust stock. The letter proposed that Disher then sign a noncompetition agreement in addition to the earlier confidentiality agreement, and also cautioned that Disher's obligation of confidentiality was intended to last "indefinitely," or until the information became known publicly through legitimate origins, whenever that may be. In effect, IRI sought to merge the confidentiality agreement into a noncompetition restrictive covenant.

Such a conversion would have rendered Disher substantially unemployable in his chosen profession. (See *Dynamics Research Corp. v. Analytic Sciences Corp.* (1980), 9 Mass. App. Ct. 254, 278 & n.32, 400 N.E.2d 1274, 1288 & n.32; *E. W. Bliss Co. v. Struthers-Dunn, Inc.* (8th Cir. 1969), 408 F. 2d 1108; *Great Lakes Carbon Corp. v. Koch Industries, Inc.* (S.D.N.Y. 1980), 497 F. Supp. 462, 471.) The circuit court's decision was not in error on this issue.

## V

■ Lastly, defendants identify error in the circuit court holding that IRI tortiously interfered with Disher's prospective economic advantage as contrary to the overwhelming weight of the evidence. They maintain that IRI's letter to A. C. Nielsen Company (Nielsen) was not tortious. That letter, sent by IRI on July 15, 1983, together with a copy of the confidentiality agreement, advised Nielsen that Disher possessed confidential information to which IRI had common law rights and defendants here argue that IRI not only had the right to apprise Nielsen of the agreement but a duty to do so upon pain of losing its rights to that information. The circuit court found that Nielsen would have hired Disher but for IRI's interference; that IRI's interference was the proximate cause of Nielsen's refusal to hire Disher; and that IRI intentionally interfered in that employment arrangement and its actions were thereby malicious. The court held that under those circumstances, IRI would be obliged to suffer the consequences of its own conduct.

The record reveals that after he was fired, Disher was offered a position with Nielsen at a salary of $75,000 per year. Disher's attorneys advised Nielsen of Disher's impending lawsuit against IRI. A meeting was scheduled between Nielsen executives, Disher and his attorneys; however, before that meeting was held, Nielsen received IRI's letter. At the meeting, Nielsen's employment offer to Disher was withdrawn. Thereafter, Nielsen offered Disher the same job conditioned upon his ability to secure injunctive relief barring IRI's enforcement of the agreement. When that relief was denied, the job was given to someone else.

Relying upon *Hahn & Clay v. A. O. Smith Corp.* (5th Cir. 1963), 320 F.2d 166, *cert. denied* (1963), 375 U.S. 944, 11 L. Ed. 2d 274, 84 S. Ct. 351, defendants claim the right to have asserted their legal claims of confidentiality even if they were mistaken as to the validity of their claims. In *Hahn & Clay*, Smith notified various parties of its trade secret covenants signed by its former employees who were already in the employ of Hahn & Clay. Smith and Hahn & Clay were

both bidding for the same contract. The court of appeals noted that in such a case the relevant issue was the defendant's good-faith assertion of rights which it believed it possessed, rather than the ultimate affirmance of those rights by a court, stating (320 F.2d 166, 169):

> "[Defendant] was privileged to send the telegram, and the copies, so long as, in so doing, it acted in good faith; that is, *believing that it held secrets entitled to legal protection* and motivated, not by malice, but by the belief that the contract negotiations would result in the impairment of the competitive value of those secrets by leading to their disclosure and that the sending of the telegram would serve to prevent that disclosure." (Emphasis added.)

Similarly, defendants here had the right to believe that they possessed legitimate interests in Disher's knowledge of confidential information, despite the subsequent ultimate conclusion by the courts that the confidentiality agreement was overly broad. Their notification to Nielsen of their claim and their intention to insist upon their rights and take legal steps to protect them is not an actionable wrong. (*Kaplan v. Helenhart Novelty Corp.* (2d Cir. 1950), 182 F.2d 311, 314; *Gasbarro v. Lever Brothers Co.* (7th Cir. 1973), 490 F.2d 424, 426; *Dinkins v. General Aniline & Film Corp.* (S.D.N.Y. 1962), 214 F. Supp. 276, 280; *Wartensleben v. Willey* (Wyo. 1966), 415 P.2d 613, 615.) From the foregoing authorities it is clear that defendants had the right to send the questioned letter to Nielsen.

■■ In Illinois, a claim for tortious interference with a prospective economic expectancy must rest upon a plaintiff's reasonable expectations of entering into a valid business relationship, a defendant's knowledge of the expectancy and intentional and malicious interference with the expectancy without just cause, to plaintiff's damage. (*Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.* (1983), 120 Ill. App. 3d 254, 258, 458 N.E.2d 115. See *Zamouski v. Gerrard* (1971), 1 Ill. App. 3d 890, 897, 275 N.E.2d 429.) Disher's right to engage in a business relationship also must be examined with regard to the rights of IRI. *Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 553, 413 N.E.2d 98.

The circuit court here ruled that in writing its letter to Nielsen, "IRI was not concerned with Disher's welfare but only its own." Further, "IRI relied upon the agreement, they represented that they had those rights, that representation was misplaced." Finally, "what is meant is not malice in the sense of ill will[,] but merely intentional interference without justification." Based upon these findings, the

court held that "the requisite malice to have tortious interference was present in this case," and the court's order so reflects.

■■ Within the context of Disher's claim against defendants for tortious interference with his prospective economic advantage, defendants were under no duty requiring them to have placed Disher's interests above their own; the circuit court's finding that they were motivated out of concern for their own welfare, rather than out of concern for that of Disher, is not controlling. Malice, as defined by the court in the case *sub judice*, is not a contemplation of defendant's corporate or personal hostility or ill will towards Disher. Many civil actions, or threats thereof, are initiated by individuals with less than amicable motivations; rather, malice is defined as an intent to do wrongful harm and injury without just cause. (*Smith-Shrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 580, 483 N.E.2d 283, *appeal denied* (1986), 111 Ill. 2d 579; *Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 530, 444 N.E.2d 579; *Clifton-Strode, No. 2, Inc. v. Kent* (1982), 110 Ill. App. 3d 525, 529, 442 N.E.2d 666.) No doubt defendants' alleged interference was intentional; however, the issue is whether they acted with just cause. Just cause for their interference depends upon a number of factors, including the interest that they sought to protect through their actions and the methods which they employed to protect their interest. (*Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 531, 444 N.E.2d 579.) The method which they used, the letter to Nielsen, which resulted in interference with Disher's interests would have had to have been legal and not unreasonable under the circumstances. 111 Ill. App. 3d 522, 531, 444 N.E.2d 579.

Applying these principles and those set forth in the preceding paragraphs to the facts of this case, it is clear that defendants were entitled to protect any proprietary rights in information that they believed, in good faith, Disher possessed. Even if their belief was mistaken, defendants were justified in sending the letter to Nielsen, together with a copy of the confidentiality agreement, and asserting that they would enforce those rights if need be, without subjecting themselves to the charge of tortious interference with Disher's prospective economic advantage. The circuit court's judgment to the contrary was in error and must be reversed.

In light of our conclusion, the issue of whether IRI's letter to Nielsen proximately caused Nielsen to decline employment of Disher need not be decided.

Upon consideration of the appeal and cross-appeal, we hold that the circuit court erred in denying plaintiff relief under section 13 of

the Securities Law and we reverse and remand for further proceedings consistent with this opinion. We affirm the circuit court upon the issues raised in the cross-appeal, except that concerned with defendants' alleged tortious interference with Disher's prospective economic advantage, which we reverse.

Affirmed in part, reversed in part, and cause remanded with directions.

FREEMAN and MURRAY, JJ., concur.*

---

*Justices Stamos and Bilandic, who participated at oral argument, have since recused themselves from further participation. Justices Freeman and Murray substituted, reviewed the briefs and record, and listened to the tape of the oral arguments.