**Charles R. CHRISTIANSON and International Trade Services, Inc., Plaintiffs,**

v.

**COLT INDUSTRIES OPERATING CORP., a Delaware corporation, Defendant.**

No. 84–4056.

United States District Court, C.D. Illinois.

March 28, 1991.

Spiro Bereveskos, Indianapolis, Ind., Richard I. Fine, Los Angeles, Cal., Stuart R. Lefstein, Rock Island, Ill., John C. McNett, Indianapolis, Ind., for plaintiffs.

Anthony M. Radice, New York City, John V. Patton, Moline, Ill., Robert L. Harmon, Chicago, Ill., for defendant.

## ORDER

MIHM, District Judge.

Before the Court is the Motion (# 92) by the Defendant Colt Industries for summary judgment on Counts I and II of the Plaintiff's Amended Complaint. The Court grants Colt's Motion for Summary Judgment in part and denies it in part.

## BACKGROUND

In 1959, Colt obtained a license from the Armalite Division of Fairchild Hiller Corporation for the rights to Armalite's AR–10 and AR–15 rifles. Colt refined the AR–15 rifle, and by approximately 1962, created a mass-producible version. Colt had to modify Armalite specifications to insure that the

mass-produced version of the rifle would maintain the parts interchangeability. Based on tolerance studies and other work by Colt's engineers, Colt set the dimensions and tolerance extremes for each part. Colt's engineers chose materials for each part, designed specialized tooling for manufacturing and testing the parts, and developed the manufacturing processes (such as heat and chemical treatment, milling, forging, stamping, and molding) to insure interchangeability and to minimize any changes in dimensional characteristics that might occur during use. Colt claims to have invested in excess of $50 million over a 25 year period in the development and continued improvement of its products.

In 1971, the United States Army adopted Colt's version of the AR–15 rifle as its standard infantry rifle. It renamed the rifle the "M16" and obtained a manufacturing license from Colt. This license enables the government to buy M16 rifles and spare parts from sources other than Colt on a competitive bid basis. In addition to the United States Government, Colt sells the M16 rifle to a number of foreign governments and to non-military customers, such as law enforcement agencies. Colt has also licensed several foreign governments to manufacture M16 rifles for their own use. Three out of four of these foreign licenses have expired.

Colt manufactures the M16 rifle and several variations, including a shortened carbine version and a non-automatic version that still carries the designation AR–15. The rifle has gone through a number of modifications, from the original M16 to the M16A1 and the current M16A2 (the term "M16" will be used to refer to all of these models). The M16A2, brought out in 1984, contains significant improvements over previous models, including an adjustable front sight, heavier barrel, round hand guard, three shot burst control, and a new buttstock. Colt asserts that it has continued to refine and change the rifle's engineering specifications.

Colt asserts that the results of Colt's engineering work relating to the M16 rifle are contained in tens of thousands of pages of detailed engineering drawings, specification sheets, studies, and tests. Colt maintains the secrecy of this material by a variety of measures. For one, Colt places proprietary legends on its drawings stating that all information therein is owned by Colt and shall not be disclosed to third parties. The drawings are kept in areas of limited access which are monitored by security personnel, and access to the drawings is restricted to authorized personnel. Colt restricts its employees by written agreements, even after their employment ends, from using or disclosing any of the confidential information which they had access to while in Colt's employ.

Colt also restricts its suppliers' use of its technical data. Like most manufacturers, Colt contracts with outside suppliers for the manufacture of component parts for the M16 rifle. Colt then assembles the finished product using these parts, along with parts Colt manufactures itself. Colt must of course provide drawings to these suppliers, but Colt has contractually obligated the suppliers not to use this information except in the manufacture of parts and accessories pursuant to their contracts with Colt. Similar restrictions on the use of Colt's technical data are placed on suppliers of parts to the United States Government, which has the right under its license from Colt to buy spare parts from outside suppliers. The contracts forbid outside suppliers from using Colt's technical data to make parts for anyone except Colt or the United States Government.

From 1970 through mid–1975, Charles Christianson was employed by Colt as an engineer. Christianson worked as a tool designer and project administrator in Colt's Singapore licensing program, and he acted as supervisor of project planning in Colt's Philippine program. As a condition of his employment, Christianson signed a confidentiality agreement prohibiting him from using or disclosing Colt proprietary information during and after the termination of his employment.

After leaving Colt in 1975, Christianson formed his own company, International Trade Services, Inc. ("ITS"). ITS obtained

Colt's proprietary drawings from the Philippine government (which was a Colt licensee at that time), and ITS contracted to supply certain M16 parts to the Philippine government. Christianson contracted to have these parts made by two of Colt's vendors, Casting Engineers and Martin Marietta.

Colt claims that when it questioned the right of Christianson, Casting Engineers, Martin Marietta and the government of the Philippines to engage in this project, Christianson sought Colt's approval for the particular project (Christianson dep. 87–88, and Defendant's Exhibit 9 Radice affidavit). Colt asserts that it then gave Christianson a letter in March 1986 which waived Colt's objections to these contracts but preserved its rights for the future. Colt contends that later, without advising Colt, Christianson entered into new contracts to supply parts to Colt's licensee in the Philippines, to Colt's licensee in Singapore, and to customers in the United States.

### HISTORY OF THE LAWSUIT

In about July of 1983, Colt learned that Springfield Armory, Inc. (Springfield), an Illinois corporation, was attempting to supply purported M16 rifles to the government of El Salvador. On September 2, 1983, Colt commenced an action in this Court against Springfield and a related corporation, Rock Island Armory, Inc. *See, Colt v. Springfield*, 83–4072 (C.D.Ill.1984) (Exhibits 1 and 2 attached to Radice affidavit). Although Springfield claimed that it had reverse engineered the entire rifle, Senior U.S. District Judge Robert Morgan found that the evidence indicated that Springfield had engaged in a scheme to misuse Colt's proprietary M16 parts drawings and had induced Colt's vendors and licensees to produce M16 parts in violation of their contractual restrictions. *Id.* (*see*, Exhibit 2 attached to Radice affidavit). On this basis, Judge Morgan entered a preliminary injunction against Springfield and Rock Island Armory, Inc. enjoining them from proceeding with their planned production of M16 rifles. The entry of the preliminary injunction against Springfield was upheld

by the Federal Circuit. *Colt Industries Operating Corp. v. Springfield Armory, Inc.*, 732 F.2d 168 (Fed.Cir.1984).

Colt asserts that during discovery before the preliminary injunction hearing in the *Springfield* case, it found that Christianson's company had supplied many of the parts Springfield used in its M16 rifles. (Gubbins dep. 50–51, Exhibit 10 attached to Radice affidavit, and Reese dep. 178–179, 359–364, Exhibit 12 attached to Radice affidavit). In the fall of 1983 Colt joined Christianson and ITS as additional defendants in the *Springfield* lawsuit and moved to include them in a similar preliminary injunction. At the same time, Colt directed its attorneys to send a number of letters to Colt suppliers and third parties to put them on notice that Colt considered dealing in unauthorized parts to be improper. (Gubbins dep. 51, Exhibit 10 attached to Radice affidavit).

Judge Morgan denied Colt's motion for a preliminary injunction against Christianson and ITS on April 19, 1984. Colt then decided to dismiss Christianson and ITS from the case, based on Christianson's testimony that his company had gone out of business. (Exhibit 10 attached to Radice affidavit at 52).

On May 14, 1984, Christianson commenced this lawsuit against Colt alleging that Colt had violated the antitrust laws by commencing litigation against him and by threatening his customers and suppliers that it would stop doing business with them if they did business with Christianson. Colt reasserted its breach of contract and other claims against Christianson as counterclaims in the new lawsuit. The case was consolidated with the *Springfield* case, so that the parties were then essentially in the same posture as they had been before Colt had voluntarily dismissed its claims against Christianson.

On September 5, 1984, the *Springfield* defendants entered into a consent judgment and permanent injunction with Colt. However, in the *Christianson* case, Christianson moved for partial summary judgment based on the fact that Colt's specifi-

cations for M16 rifle parts could not be maintained as valid trade secrets because they should have been disclosed in certain patent applications. Also, Christianson added a second count to his complaint alleging tortious interference with contractual relations. Colt then made a motion for partial summary judgment on both the patent law and tortious interference claims.

In May 1985, Judge Morgan granted Christianson's Motion for Summary Judgment on liability on the entire antitrust and tortious interference complaint. *Christianson v. Colt Industries Operating Corp.*, 613 F.Supp. 330 (C.D.Ill.1985). The Court stayed its decision pending Colt's appeal. *See, Christianson v. Colt Industries*, 613 F.Supp. 330 (C.D.Ill.1985) (Exhibit 6 attached to Radice affidavit).

The history of the appeal delineates the issues which remain in this case. Three of the five appellate decisions are concerned with the respective jurisdictions of the Federal Circuit as opposed to the regional Circuit Courts of Appeal. *See, Christianson v. Colt Industries Operating Corp.*, slip op. 85–2644 (Fed.Cir. Dec. 4, 1985); *Christianson v. Colt Industries Operating Corp*, 798 F.2d 1051 (7th Cir.1986); and *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). The other two appellate decisions, which were on the merits, included a Federal Circuit opinion which was vacated on jurisdictional grounds by the Supreme Court, and a subsequent decision by the Seventh Circuit which upheld Colt's position on the patent/trade secret issue raised by Christianson. *Christianson v. Colt Industries Operating Corp.*, 822 F.2d 1544 (Fed.Cir.1987); *Christianson v. Colt Industries Operating Corp.*, 870 F.2d 1292 (7th Cir.1989). Both Courts concluded that Colt's patents need not have included the proprietary technical data Christianson claimed was necessary under 35 U.S.C. § 112.

In *Christianson*, 870 F.2d at 1295, the Seventh Circuit found that summary judgment should be entered for Colt on the issue of the adequacy of Colt's patent disclosures under 35 U.S.C. § 112. The Seventh Circuit then remanded the case for further proceedings on the other issues. *Id.*

Colt maintains that the only issues which remain in the case after the Seventh Circuit decision are related to Christianson's claim that the manner in which Colt enforced its trade secrets and other intellectual property rights was illegal.

As Christianson argues, however, the Seventh Circuit made no determination on the enforceability of Colt's trade secrets. *Id.* at 1303. Further, the Court of Appeals expressly left open the question of the liability of Colt under federal antitrust law. *Id.* at 1302–1303, n. 8. Thus, the Seventh Circuit left open all of Christianson's claims except his claim that Colt's patent was invalid.

Counts I and II are left in Christianson's complaint. In Count I, Christianson alleges that Colt illegally monopolized the market in M16 parts and successfully organized a group boycott of Christianson in violation of §§ 1 and 2 of the Sherman Act and §§ 4 and 16 of the Clayton Act. Christianson alleges in Count II that, under Illinois law, Colt tortiously interfered with Christianson's business opportunities.

## I. CHRISTIANSON'S ANTITRUST CLAIM

### A. Does the Alleged Group Boycott in this Case Justify Classifying this Conduct as a Per se Violation of the Antitrust Laws?

Colt has conceded that it insisted on its suppliers nondisclosure of Colt's trade secrets as a condition of its suppliers continuing business relationships with Colt. (*See* p. 47 of Defendant's brief). It is disputed whether or not Colt had the right to insist that its suppliers could not use the alleged trade secrets.

Christianson's claims under § 1 of the Sherman Act are essentially based on the allegation that the suppliers of ITS (Christianson's company) and the customers of ITS unlawfully agreed with Colt to refrain from supplying and purchasing M16 parts and accessories to or from ITS. (*See* ¶ 23

of the Complaint, Exhibit 3 attached to the Radice affidavit). Christianson contends that this alleged agreement constitutes a group boycott which is a *per se* violation of § 1 of the Sherman Act.

Colt contends that the *per se* rule is completely inapplicable because the evidence shows no horizontal agreement among competitors at any level and no vertical agreements as to price. Colt maintains that the evidence only shows agreements between Colt and its suppliers restricting the use of trade secrets and Colt's trade secrets enforcement efforts.

Colt argues that boycotts are illegal *per se* only if they are used to enforce agreements that are themselves illegal *per se*—for example, price fixing agreements. *Collins v. Associated Pathologists, Ltd.*, 676 F.Supp. 1388, 1398–1399 (C.D.Ill.1987) (quoting *Marrese v. American Academy of Orthopaedic Surgeons*, 706 F.2d 1488, 1495 (7th Cir.1983), vacated on other grounds, 726 F.2d 1150 (7th Cir.1984), *rev'd*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985)), *aff'd*, 844 F.2d 473 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

In the *Collins* case, *Id.* at 1398, this Court noted that the Seventh Circuit explained its own understanding of illegal boycotts in cases such as *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781 (7th Cir.1981). In *U.S. Trotting,* the court began its discussion of the plaintiff's antitrust claims by stating that the Rule of Reason is the standard traditionally applied for the majority of alleged anticompetitive practices challenged under § 1 of the Sherman Act; however, a particular course of conduct will be termed a *per se* violation after courts have had considerable experience with the type of conduct challenged and application of the Rule of Reason has inevitably resulted in a finding of anticompetitive effects. *Id.* at 787–788. The court in *U.S. Trotting* further explained that the Supreme Court has found certain group boycotts illegal *per se,* but that a *per se* rule had never been applied by the Supreme Court to concerted refusals

to deal which were not designed to drive out competitors. *Id.*

Christianson cites two Supreme Court cases in which group boycotts were found to be *per se* illegal. *See, Fashion Originators Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) and *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

In response, Colt cites *Kling v. St. Paul Fire and Marine Insurance Co.,* 626 F.Supp. 1285 (C.D.Ill.1986), another case decided by this Court. In the *Kling* case, the plaintiffs alleged an agreement between the defendant hospital and the defendant St. Paul Fire and Marine Insurance Co. which required all doctors and dentists with staff privileges at the hospital to carry a minimum of $1 million in medical malpractice insurance coverage. *Id.* at 1288–1289. This Court found that application of the *per se* rule was inappropriate in that case because the Supreme Court has found group boycotts *per se* illegal only in cases involving either price fixing or agreements among competitors. *Id.* at 1291. In the *Kling* case it was clear that there was no price agreement and that the insurance company was not in competition with the hospital. *Id.* Colt asserts that in this case, as in *Kling,* there is no evidence of a price fixing agreement or an agreement among competitors.

Colt also cites *Business Electronics v. Sharp Electronics,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). In *Business Electronics, Id.* at 730, 108 S.Ct. at 1522, the court stated that:

Restraints imposed by agreement between competitors have traditionally been nominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.

*Id.* at 730, 108 S.Ct. at 1522. In this case, if there were any restraints, the evidence shows that the restraints were vertical restraints because the restraints were imposed by Colt, which is at a different level of the distribution chain than the suppliers of component parts for the M16.

The *Business Electronics* Court concluded that a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels. *Id.* at 735–736, 108 S.Ct. at 1525–1526. Since this case involves vertical restraints and there is no allegation that there was an agreement on price or price levels, there is no *per se* violation. Christianson cannot rely on *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) or *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), because the Supreme Court stated in *Business Electronics* that these cases involved horizontal combinations. *Id.* 485 U.S. at 734, 108 S.Ct. at 1525. Even further, Christianson cannot rely on *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) because the Court determined in *Business Electronics* that *Parke, Davis* did not support a rule that an agreement on price or price levels is not required for a vertical restraint to be *per se* illegal. *Id.* 485 U.S. at 735, 108 S.Ct. at 1525.

Christianson asserts that there is a horizontal conspiracy in this case. He asserts that at least Casting Engineers and Aerospace Nylok agreed with Colt to cease doing business with Christianson after receiving Colt's letters, which made it obvious that they, along with other Colt suppliers, were being solicited in a common purpose. (*See,* Stillwell affidavit at ¶ 7, Exhibits D, E, and F and Plaintiff's Exhibit 8, ¶ 11).

This Court disagrees. Although there is evidence that Colt attempted to force all of its component suppliers to cease doing business with Christianson, there is no evidence that the component suppliers themselves had any agreement at the component supplier level, and there is no evidence that Colt had agreed with anyone else at its level of production and distribution. Thus, the only agreement asserted in this case is on the vertical level.

Christianson then contends that *Business Electronics* is distinguishable because it involved a concerted refusal to deal rather than a classic boycott such as the present case. Christianson quotes from the case of *Northwest Stationers v. Pacific Stationery*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), which explained when a *per se* approach was applied to a group boycott. The Court stated:

Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." (Citations omitted). In these cases, the boycott often cuts off access to a supply, facility, or market necessary to enable the boycotted firm to compete (citations omitted), and frequently the boycotting firms possessed a dominant position in the relevant market. (Citations omitted). In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances, the likelihood of anticompetitive effects is clear and the possibility of countervailing pro-competitive effects is remote.

*Id.* at 294, 105 S.Ct. at 2619.

Certainly, in this case, Colt may have engaged in conduct which denied Christianson the relationships he needed to survive. However, this does not automatically mean that this is a proper case in which to apply a *per se* rule. The *Business Electronics* case has in effect modified the rule in *Northwest Stationers*. In *Business Electronics*, the court stated:

Second, petitioner contends that *per se* illegality here followed from our two cases holding *per se* illegal a group boycott of a dealer because of its price cutting. *See, United States v. General Motors Corp.*, 384 U.S. 127, [86 S.Ct. 1321, 16 L.Ed.2d 415] (1966); *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207 [79 S.Ct. 705, 3 L.Ed.2d 741] (1959). This second contention is merely a restatement of the first, since both cases involve horizontal combinations—*General Motors*, supra [384 U.S.], at 140, 143–145 [86 S.Ct. at 1327, 1329–1330], at the dealer level, (footnote omitted) and

*Klor's,* supra [359 U.S.] at 213 [79 S.Ct. at 710], at the manufacturer and wholesaler levels.

*Business Electronics,* 485 U.S. at 734, 108 S.Ct. at 1525. Based upon this quotation and the rest of the *Business Electronics* opinion, it seems clear to this Court that the *Business Electronics* majority felt that a *per se* rule would be appropriate in a group boycott which involved horizontal combinations but inappropriate in a case involving vertical combinations. The Court in *Business Electronics* obviously believed that horizontal restraints involved dangers which justify application of a *per se* rule, but the Court did not believe that the dangers involved in vertical arrangements justified the application of a *per se* rule. The Court even noted that some vertical arrangements have economic benefits and are pro-competitive. *Id.* at 723–731, 108 S.Ct. at 1518–1523. Thus, this Court believes that it would be inappropriate in this case to apply a *per se* rule.

In addition, this Court believes that it would be improper to apply a *per se* rule under the analysis given in *Northwest Stationers.* After making the statements which were previously quoted, the Supreme Court in *Northwest Stationers* stated:

> Although a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anti-competitive consequences.

*Northwest Stationers,* 472 U.S. at 295, 105 S.Ct. at 2620. The Supreme Court then discussed several examples of cases in which it would have been improper to apply a *per se* rule. *Id.* at 295–297, 105 S.Ct. at 2620–2621. The Court noted the following:

> The district court appears to have followed the correct path of analysis— recognizing that not all concerted refusals to deal should be accorded *per se* treatment and deciding this one should not. (Footnote omitted). The foregoing discussion suggests, however, that a satisfactory threshold determination wheth-

er anticompetitive effects would be likely might require a more detailed factual picture of market structure than the district court had before it. Nonetheless, in our judgment the district court's rejection of a *per se* analysis in this case was correct. *A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anti-competitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive.*

*Id.* at 297–298, 105 S.Ct. at 2621 (emphasis added).

In this case, Colt has made several very plausible economic arguments that the protection of trade secrets through contractual obligations as they used in this case enhances overall efficiency. First, protection of trade secrets can foster innovation because, if a firm knows that it can develop a better product and keep it secret, it has the incentive to invest the resources on the innovation. In other words, the protection of trade secrets internalizes the cost of innovation. Second, allowing a firm to protect its trade secrets separates innovation from production; therefore, an innovator will not have to do all the production itself (which is often economically inefficient) but will have an incentive to contract the technology out to the lowest cost producer. Finally, legal protection of trade secrets can reduce the other resources that firms must devote to protecting such secrets. (*See,* affidavit of William Landes at 16–17).

On the other side of the coin, allowing the protection of trade secrets can have anticompetitive effects such as limiting the ability of a competitor like Christianson to find component part producers other than Colt.

Despite this anticompetitive effect, application of a *per se* rule here is not justified. As stated above, protection of trade secrets can have significant positive economic benefits in promoting innovation and competition. Also, the law has sanctioned the use

of trade secrets under the common law for a long period of time. This Court does not believe it would be appropriate to strike down this longstanding protection of trade secrets under a *per se* rule. This Court believes that it is more appropriate here to apply the Rule of Reason analysis to determine whether the anticompetitive consequences of the restraint on trade caused by the trade secrets in this case are justified. Finally, the likelihood of anticompetitive effects is not clear in this case without an in depth analysis of the economic arguments. *See, Business Electronics,* 485 U.S. at 724, 108 S.Ct. at 1519, *citing, National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1988) (agreements are *per se* illegal only if their "nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.")

Thus, this Court believes that the application of the Rule of Reason is appropriate in this case. However, Colt asserts that Christianson has been proceeding on a *per se* theory throughout this case and on appeal [1]; therefore, it contends that Christianson should not be permitted to switch to a Rule of Reason analysis. *See, Polk Brothers v. Forest City Enterprises,* 776 F.2d 185, 191 (7th Cir.1985).

In the transcript of the oral arguments to the Seventh Circuit, the following discussion resulted:

[Christianson's Attorney]: ... With regard to the antitrust issues, as suggested by Justice Brennan, we do have the possibility of prevailing irrespective of how § 112 is resolved.

Court: *Per se* theory or Rule of Reason theory?

[Christianson's Attorney]: *Per se* theory by my analysis based upon cases such as *Fashion Originators* or *Klor's.*

(Exhibit 3 attached to supplemental affidavit of Radice).

---

1. See attachments to supplemental affidavit of Anthony M. Radice, including: Exhibit 1 at 45–48 (Christianson's brief before the Seventh Circuit); Exhibit 2 at 9–10 (Christianson's supplemental brief before the Seventh Circuit); and Exhibit 3 (transcript of the argument before the Seventh Circuit at 44).

This Court believes that the *Polk* case is distinguishable. *See, Polk,* 776 F.2d at 191. In that case, the court stated in relevant part:

There was a full trial, and Forest City did not offer evidence from which the court could find market power. It does not suggest that we affirm the judgment on Rule of Reason grounds. Forest City has litigated the antitrust issue as one in which it prevails under the *per se* rule or not at all. "Not at all" it must be.

*Id.* (emphasis added).

In this case, there has been no trial. Also, Colt's Motion for Summary Judgment seems to anticipate that Christianson would argue that a Rule of Reason analysis could apply in this case because Colt addresses issues related to a Rule of Reason analysis (such as anticompetitive effect) in its brief, and Colt has submitted an expert opinion on these issues. (*See* affidavit of Landes). Further, Colt has not shown that it will suffer any prejudice if Christianson is allowed to raise this issue because there is no evidence that Colt is not in a position to defend against these claims.

B. *Has Colt Waived its Ability to Assert Use of its Trade Secrets as a Defense to Antitrust Liability?*

Both the Supreme Court and the Seventh Circuit opinions left open the "permission letter issue." *See, Christianson,* 108 S.Ct. at 2175–2176; *Christianson,* 870 F.2d at 1303. Christianson asserts that, if Colt asserts the trade secrets as a defense to antitrust liability, these trade secrets were unenforceable as to Christianson based upon the doctrines of waiver, estoppel and laches because Christianson was given permission by letter to use the trade secrets. As Christianson contends, a Rule of Reason inquiry examines the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. *National Society of Professional Engineers v. United States,* 435 U.S. 679,

692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

In response, Colt basically asserts that Christianson cannot rely on the permission letter in arguing that its trade secrets are invalid as to them because the letter clearly reserved the right to enforce their trade secret agreements after Christianson had fulfilled the contract with the Philippines.

■ Christianson maintains that in March 1976, Christianson told Gubbins, who represented Colt at that time, that Philippine officials had represented to him that they had the right to purchase the parts at issue outside the country from sources other than Colt and that Christianson had entered into contracts with Casting Engineers and Martin–Marietta in reliance on those assurances. Christianson asserts that by letter dated March 11, 1976, Gubbins set forth the representations made to him by Christianson, and then carefully delineated the scope of Colt's waiver of its rights.

Colt argues that Mr. Gubbins only told Christianson that Colt would waive its objection to these existing contracts with the Philippines. Colt quotes a section of the letter which states:

> As to the existing situation, however, where you have entered into binding contracts with Martin–Marietta and Casting Engineers, Inc., and have expended monies for tooling to be used other than Colt-furnished tooling, we have agreed that upon an "ad hoc" basis, we will and have advised these two companies that we will not object to their fulfilling their contracts with you. This is not to be deemed a waiver on our part as to any rights—proprietary, contractual, or otherwise—we may have as to any future situations of this kind, and to the extent that this is a waiver of our rights as to the existing contracts you have with those suppliers, is to be strictly limited to subject contracts.

In response, Christianson notes that he spent approximately $50,000 for tooling which was utilized by Casting Engineers of Illinois and Martin–Marietta to produce the parts for the M16. The tooling was developed from drawings which Christianson had received from the government of the Philippines. Also, Christianson observes that Colt has not cited the entire permission letter in their brief or included it as an exhibit. (*See* Plaintiff's Exhibit 1). Christianson quotes the following from the letter:

> You stated that both Martin–Marietta and Casting Engineers, Inc. contacted Colt representatives upon your offering purchase orders to them, and were told by Colt representatives that so long as they did not use Colt-furnished tooling or Colt-furnished drawings or specifications, Colt could have no objection to their furnishing these items to you. You have stated to us, and those companies have stated to us, that they are using new tooling not obtained from Colt and drawings and specifications obtained, not from Colt, but from the government.

This letter went on to state:

> Colt representatives had a meeting in Hartford in November of 1974 with representatives of the government of the Philippines and with representatives Elitool, the private Philippine corporation which is making the M16 rifles for the Philippine government. At the meeting, it was apparently agreed that the government had the right to purchase subject castings, forgings, and extrusions from suppliers other than Colt.

Christianson contends that Gubbins and Colt representatives knew that the only place the Philippines could have obtained drawings for the M16 was from Colt since the Philippines was a licensee of Colt. In fact, Christianson notes that Colt's position has always been that no one else could have made their own drawings because no one could reverse engineer M16 parts. Thus, Christianson asserts that both Colt and Christianson understood that the letter meant that a non-Colt drawing was one immediately emanating from a source other than Colt but which was initially acquired from Colt. Christianson maintains that the letter allowed him to continue to purchase from his component part suppliers for any customers as long as he used

non-Colt tooling as defined above. Christianson also includes the telegram which was sent to Casting Engineers on March 11, 1976 as an exhibit. It reads:

> You may supply M16 castings to International Trade Services, Inc. provided parts are not ordered against Colt drawings and Colt tooling is not utilized. (Plaintiff's Exhibit 2).

Christianson argues that this maintains the same definitional framework.

Christianson asserts that he spent large sums of money in order to advance his business and that he invested eight years of his life in working on the business after this letter before Colt took any further action. (*See* Plaintiff's Exhibit 7). At the same time, he asserts that Colt knew of his activities in the Philippines because Colt had several employees stationed in Manila from July of 1975 through August of 1977, including Douglas Lynds, the program manager for Colt. Even further, because Casting Engineers and Martin–Marietta were regular Colt suppliers of parts with whom Colt had an ongoing business relationship, Christianson contends that Colt should have known that Christianson participated in contracts after the initial Philippine purchase. (*See* Plaintiff's Exhibit 7).

Colt replies that, even if they granted Christianson permission in 1976 to use these drawings by the Philippine government, Colt revoked that permission in 1983 after learning the extent of Christianson's sales. Colt asserts that because Christianson gave no payment or other consideration in return for the permission granted by Colt that Colt could terminate the permission at any time since the letter, which did not provide for a specified duration, was terminable at will. *H.L. Miller Machine Tools, Inc. v. Acroloc, Inc.*, 679 F.Supp. 823, 825 (C.D.Ill.1988).

The *Miller* case, another case decided by this Court, involved the termination of a distributorship contract which was terminable at will. Under a contract which is terminable at will, both parties to some extent assume the risk that the other party may terminate even though it has relied on the agreement. However, the doctrines of waiver, estoppel and laches would not exist if a party could terminate at will at any time and under any circumstances.

Colt also argues that even a monopolist does not incur antitrust liability by extending a helping hand to a competitor, though not required to do so, and later withdrawing it. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 376 (7th Cir.1986), rehearing denied, 802 F.2d 217 (7th Cir.1986) (per curiam), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987).

The *Olympia* case is distinguishable because in that case the monopolist, Western Union, simply stopped referring customers to Olympia. *Id.* at 372–373. The Seventh Circuit simply ruled that the monopolist has no duty to help a bystander. In this case, Colt affirmatively attempted to prevent Christianson's suppliers from dealing with Christianson by threatening to revoke its business relationship with the suppliers.

It is clear from this discussion that there are questions of material fact regarding the extent of the permission granted under the permission letter and the extent to which this should result in the application of the doctrines of estoppel, waiver, or laches. The application of these doctrines, if they apply, would impact the reasonableness of the alleged restraint of trade in this case.

C. *Did Colt's Activities to Enforce its Trade Secrets Enjoy Antitrust Immunity Under the Noerr–Pennington Doctrine?*

Colt contends that its invocation of the protection of its trade secrets is immunized by the *Noerr–Pennington* doctrine, which holds that the First Amendment to the United States Constitution immunizes from antitrust liability *bona fide* lobbying and litigation efforts, regardless of any anticompetitive motive behind those efforts. *See, California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad President's*

*Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Colt asserts that not only is litigation such as its 1983 suit against Christianson protected, but further that this immunity also extends to prelitigation activity, such as cease and desist letters. *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1367, rehearing denied, 699 F.2d 1163 (5th Cir.1983); *Barq's Inc. v. Barq's Beverages, Inc.,* 677 F.Supp. 449, 453 (E.D.La. 1987).

Colt further contends that the only exception to *Noerr–Pennington* immunity is "sham" litigation, i.e., baseless litigation brought in bad faith for the purpose of obstruction and without reasonable prospect of success. *California Motor Transport Co.,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642.

■ Christianson first argues that he has created a factual question regarding whether Colt's litigation efforts against Christianson were in bad faith because he alleges that Colt knew before it filed its lawsuit that it had granted Christianson permission to use its trade secrets.

This Court disagrees with Christianson. As one court has stated:

> In invoking the "sham exception" to the *Noerr–Pennington* doctrine, the plaintiffs have the burden of proving that the defendant's activities were not really efforts to vindicate rights in court, but instead were efforts to interfere directly with their businesses. *The plaintiffs must prove the defendant's bad faith by clear and convincing evidence. See, MCI Communications v. American Telephone and Telegraph Co.,* 708 F.2d 1081, 1155 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (footnote omitted).

*G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 676 F.Supp. 1436, 1476 (E.D. Wis.1987), *aff'd,* 873 F.2d 985 (7th Cir. 1989).

In this case, Christianson has failed, as a matter of law, to carry his burden. As Colt contends, if anything, it is difficult to understand how Christianson arrived at such a broad reading of the "permission letter." Further, even if Colt had actual knowledge of Christianson's alleged unauthorized activities and did nothing to stop him, this Court does not believe that this is sufficient to show Colt acted in bad faith by clear and convincing evidence where Colt, at least arguably, had legitimate trade secrets. At most, Colt could have anticipated that Christianson would have asserted waiver, estoppel, or laches as a defense.

■ In the alternative, Christianson contends that, although immunity under the *Noerr–Pennington* doctrine may extend to prelitigation activity such as cease and desist letters, the letters which were sent to its suppliers were not cease and desist letters threatening litigation. Christianson asserts that Colt only threatened to stop doing business with any company continuing to supply Christianson.

In *Coastal States,* the court stated the following regarding cease and desist letters:

> *Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation.* The litigators should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced in a possible effort to compromise the dispute. This is the position taken by most of the courts that have considered the question. (Footnote omitted).

*Coastal States,* 694 F.2d at 1367 (emphasis added); *see also, Allied Tube and Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); *Metro Cable Company v. CATV of Rockford, Inc.,* 516 F.2d 220, 225 (7th Cir.1975); *FTC v. Superior Court Trial Lawyers Association,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Christianson maintains that *Coastal States,* 694 F.2d at 1367, has no application in this case because Colt's economic threats were not "those acts reasonably and normally attendant upon effective litigation."

Christian has submitted a letter from Colt to Casting Engineers, one of Christianson's suppliers, which is dated April 12, 1983. The letter states:

Dear Mr. Peluso: Your concern, as relayed by R. Bruneau, regarding the implications of your current production of M16 hammers for International Trade Services has been forwarded to our legal counsel. *As advised in our letter to you dated January 26, 1983, attached, any production of M16 parts for other than the U.S. Government or Colt is in violation of our proprietary rights in connection with the manufacture of the M16.* We request your assistance and cooperation in terminating all third party solicitations or production orders in your possession. *As expressed in your conversation with R. Bruneau on March 30, 1983, it is my understanding that Casting Engineers does not intend to jeopardize its longstanding relationship or future business with Colt.* We accept and appreciate your intentions. Please provide us, within ten days, written confirmation that you have ceased and desisted all production and shipments and that you will refrain from any future shipments of M16 components to parties other than Colt or the U.S. Government.

(*See* Plaintiff's Exhibit 3) (emphasis added).

The first paragraph of the letter appears to be an implied threat that Colt will litigate if its proprietary rights are violated. This, of course, is a threat which is reasonably and normally attendant upon effective litigation. However, the second paragraph of the letter refers to a conversation in which Casting Engineers was informed that Colt would discontinue business with Casting Engineers if it did not discontinue its business relationship with anyone other than the U.S. Government or Colt. This threat is not necessarily required for effective litigation, and the threat really appears to be an assertion of Colt's economic power. The effectiveness of Colt's threat is evidenced by a reply letter from Casting Engineers to Colt, dated May 16, 1983, which states that Casting Engineers would discontinue business with any third parties

unless it was authorized in writing by either Colt or the United States to do business with that party. (*See* Plaintiff's Exhibit 4).

Also, Christianson's affidavit asserts that Lone Star Ordinance and Aerospace Nylok advised Christianson that they ceased doing business with Christianson because of Colt's threats. (*See* Plaintiff's Exhibit 8 at ¶¶ 10, 11).

Further, Christianson contends that Colt has conceded that Colt's suppliers would be denied continuing business relationships with Colt unless they acquiesced in Colt's demands. (*See* Colt's memorandum in support of its Motion for Summary Judgment at 47, Document # 93). Colt stated in its memorandum:

Here, Colt stands in the shoes of the malpractice carrier in *Kling, insisting on its supplier's non-disclosure of Colt's trade secrets as a condition of the supplier's continuing business relationships with Colt.*

*Id.* (emphasis added).

Based upon the letter from Colt to Casting Engineers, Christianson's affidavit, and upon Colt's apparent concession in its brief, this Court concludes that there is a question of material fact regarding whether or not Colt's threats were limited to those reasonably and normally attendant upon effective litigation.

D. *Has Christianson Shown that Colt had Monopoly Power in a Properly Defined Relevant Market?*

 As an essential element of a § 1 or a § 2 claim under the Sherman Act, a plaintiff must allege and prove that the defendant possessed monopoly power in the relevant market. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966); *Collins v. Associated Pathologists, Ltd.,* 676 F.Supp. 1388, 1404 (C.D.Ill.1987), *aff'd,* 844 F.2d 473 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir.), *cert.*

*denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

■ Market power is the ability of a single firm to raise prices without losing enough sales volume to render the price increases unprofitable (Landes affidavit at ¶ 11). Generally, a firm must have a substantial share of an economically relevant market in order to have significant market power. *(Id.).*

■ In determining what constitutes a relevant market for antitrust purposes, the goal is to "delineate markets which conform to areas of effective competition and to realities of competitive practice." *Sargent–Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 710 (7th Cir.1977) quoting *L.G. Balfour Co. v. FTC,* 442 F.2d 1, 11 (7th Cir.1971), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). The relevant product market consists of all products that are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. DuPont De Nemours and Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its products or services for sale. *Collins v. APL,* 676 F.Supp. at 1404, citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Christianson's complaint apparently defines the relevant product and geographic markets as the domestic and foreign market for the manufacture, marketing and sale of M16 rifles, parts, and accessories. (Complaint ¶¶ 12, 24 attached as Exhibit 3 to the Radice affidavit).

■ The record does not support Christianson's assertion that Colt has monopoly power in the product market for M16 rifles. A properly defined product market includes all products which are reasonable substitutes[2] for a particular product. *DuPont,* 351 U.S. at 395, 76 S.Ct. at 1007; *see also, Bushie v. Stenocord Corporation,* 460 F.2d 116, 121 (9th Cir.1972); *Domed Stadi-*

*um Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 487–488 (5th Cir.1984); (affidavit of Landes at ¶¶ 12, 15).

An initial purchaser of an assault rifle such as the M16 has a large number of different types of assault rifles to choose from. (Stillwell affidavit at ¶¶ 12–17). In the military market the M16 competes with at least two dozen comparable products. *(Id.* at ¶ 16). In the civilian market, the M16 is a semi-automatic rifle, the AR15, which competes with rifles of various sizes and makes. *(Id.* at ¶ 17).

Christianson does not assert that M16 is so unique that other assault rifles cannot compete with it. Rather, Christianson argues that, once a government has standardized its armed forces with the M16, there is no reasonable substitute. However, Christianson has offered no evidence, other than the bare assertions of its expert, to show that Colt has monopoly power over a government's initial purchase of assault weapons. For this reason, Christianson cannot contend, for example, that Colt had monopoly power over the United States Government when it made its initial purchase of the M16. Further, the fact that under Colt's licensing agreement with the United States, the United States pays Colt a royalty for all purchases of M16 rifles and parts which are not made by Colt does not necessarily show that Colt has monopoly power. As stated earlier, since the United States could have purchased a number of different types of assault rifles before it standardized on the M16, Colt did not have monopoly power over the United States at the time the United States originally purchased the rifles. Therefore, because the United States freely entered into the royalty agreement in a competitive environment, this Court cannot conclude that Colt's subsequent enforcement of this royalty agreement is an example of Colt's use of monopoly power.

■ It is also clear that Colt does not have monopoly power over the United States in the M16 and replacement parts

**2.** A substitute is a product which is reasonably interchangeable by consumers for the same pur-

poses. *See, DuPont,* 351 U.S. at 395, 76 S.Ct. at 1007.

market, even though the M16 is a standardized rifle of the United States armed forces. As Christianson contends, the United States and other governments require the use of rifles for its armed services which are completely interchangeable in order to facilitate quick repair and replacement. (*See* affidavit of Jeffrey L. Harrison, Plaintiff's Exhibit 16 at ¶ 6). Thus, if Colt controlled the entire market for the manufacturing of additional M16's and their replacement parts, the United States and other governments which have standardized their armed forces with the M16 could possibly be forced to pay higher prices for additional rifles and parts. However, in his case, it appears that the United States anticipated this problem. The United States has a license with Colt which permits it to contract with third party suppliers for M16 rifles and parts. Under this contract, the United States can give Colt's drawings to third parties to make the replacement parts. Thus, there is competitive bidding on contracts with the United States. In fact, the United States qualified eight firms to bid for the most recent five year M16 contract, and the contract was awarded to FN Manufacturing, Inc. and not to Colt. (*See,* Stillwell affidavit at ¶ 19 and attached Exhibit L).

Despite the foregoing, at oral argument, Christianson asserted that Colt is currently arguing in a lawsuit against the United States that the United States does not have the right to give any of the trade secrets to anybody to make anything because the trade secrets are the sole property of Colt. (*See* document # 121 at 45, the transcript of the hearing on the Motion for Summary Judgment of May 17, 1990).

However, Christianson included Colt's Complaint as an exhibit. (*See* Plaintiff's Exhibit # 21, civil action # 89–1535 in the United States District Court for the District of Columbia involving *Colt v. United States,* 716 F.Supp. 660 (D.D.C.1989)). As this Court reads the Complaint in *Colt v. United States,* Colt is asserting that the United States has wrongfully withheld roy-

alty payments and that the United States is selling replacement parts to foreign nations such as Indonesia and Thailand in violation of its licensing agreement with Colt. This Court does not understand the Complaint to make the broad assertions which Christianson attributes to it. Therefore, this Court concludes that Colt does not have monopoly power over the United States.

■ Christianson also argues that Colt has monopoly power over the replacement parts market with foreign governments who use the M16 as their standardized rifle. Christianson's expert asserts that these governments do not have the ability to purchase reasonably interchangeable parts from any other source other than Colt or its licensees. (*See* Plaintiff's Exhibit 17, the affidavit of Harrison at ¶¶ 28, 29). Also, Christianson asserts in his affidavit that:

> Representatives of both the Philippines and Singapore advised me on occasions that they desired to have me bid on M16 items because my prices were cheaper than pricing obtained from Colt.

(*See* Plaintiff's Exhibit 7, Christianson's affidavit at ¶ 17).[3] Christianson's expert, Jeffrey Harrison, stated in his affidavit that Colt's close control of the market with its licensing agreements appears to have impeded entry into the market, and he states that complaints from purchasers about prices charged by Colt for replacement parts is consistent with monopoly power. (Plaintiff's Exhibit 17, affidavit of Harrison at ¶ 28).

This Court concludes that Christianson has created an issue of material fact regarding whether Colt possesses monopoly power over the replacement parts market (the product market) with foreign governments who use the M16 as their standardized rifle (geographic market). In its reply, Colt vigorously contested whether or not it had monopoly power over the United States in the replacement parts market; however, Colt made no arguments regarding whether or not it had market power over foreign governments in the replacement parts mar-

---

**3.** Although Christianson's statements appear to be hearsay, Colt has made no objection to them; therefore, this Court will consider them for purposes of this summary judgment motion.

ket. (*See*, Defendant's Reply Memorandum at 18–19, document #115). Thus, Professor Harrison's assertion regarding the effect of Colt's licensing agreements on foreign governments in the replacement parts market is undisputed. Further, the undisputed facts in this case about Colt's licensing agreements with its suppliers and its licensing agreement with the United States (*see*, Exhibit K attached to the Stillwell affidavit, Colt's licensing agreement with the United States) arguably support Professor Harrison's position. Colt's complaint filed against the United States in the case of *Colt v. United States* and Colt's licensing agreement with the United States both seem to support the position that the United States can sell a fully manufactured M16 but not replacement parts to foreign governments. (*See*, Plaintiff's Exhibit 21, *Colt v. United States*, 716 F.Supp. 660 (¶ 30 of the Complaint filed on May 26, 1989 in the U.S. District Court for the District of Columbia) Exhibit K attached to Stillwell affidavit, see above). Also, it is undisputed that Colt's suppliers cannot sell replacement parts without Colt's permission.

In addition, at oral argument Colt informed the Court that it had a licensing agreement with the Philippines government which allowed the Philippines to make M16 parts in the Philippines. Colt conceded that the Philippines asserted that it had the right to hire licensees outside the country such as Christianson to make M16 parts. (*See* transcript of oral argument held before this Court on May 17, 1990, document #121 at 5–7). As Christianson asserts, this dispute between the Philippines and Colt lends some support the proposition that Colt is attempting to assert market control over this market. Even further, Christianson has submitted a letter which indicates that Colt has had disputes over the sale of replacement parts with the Republic of Singapore, the Republic of Korea, and the Philippines. (*See*, Plaintiff's Exhibit 19). Moreover, Christianson notes that Colt has long been in pending litigation with Korea and a Korean company, Daewoo, regarding whether they may freely use M16 drawings to make M16 parts.

*See, Volt v. Daewoo Corp.*, 84 Civ. 1808 (S.D.N.Y.), and *Colt v. Republic of Korea*, International Center for the Settlement of Investment Disputes.

Christianson also contends that Colt possessed monopsony power (control of demand by a single purchaser) over its suppliers which was the immediate basis for the successful threat against Casting Engineers and Aerospace Nylok which resulted in the shut down of Christianson's business. As Christianson notes, monopsony power is within the prohibition of § 2 of the Sherman Act. *United States v. Griffith*, 334 U.S. 100, 108, 68 S.Ct. 941, 946, 92 L.Ed. 1236 (1948); *see also, Klor's v. Broadway Hale*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Professor Harrison, Christianson's expert, opined the following regarding Colt's monopsony power:

> Colt also participates in the M16 parts markets as a buyer in that it purchases parts from independent manufacturers for the original assembly of the M16 rifle and for resale in the replacement parts market. *If these manufacturers must make a substantial investment in equipment, design or training in order to produce M16 rifle parts or if the volume of output produced to sell to Colt is necessary to operate their plants efficiently, Colt possesses monopsony power in this market.* In other words, there exists a group of "captive suppliers." Colt's ability to cut-off the supply of parts to the plaintiff in this case by threatening Casting Engineers with the loss of business if it did not stop selling to International Trade Services is highly indicative of monopsony power. Moreover, this use of monopsony power strengthens Colt's position as a monopolist.

(*See* Plaintiff's Exhibit 16, affidavit of Harrison at ¶ 31) (emphasis added).

Colt correctly contends that Christianson has submitted no evidence to support the underlying basis for Professor Harrison's opinions. There is no evidence in the record showing that Colt's suppliers must make a substantial investment in equipment, design, or training in order to pro-

duce the M16 rifle parts or showing that the output produced to sell to Colt is necessary to operate their plants efficiently. Further, Colt has submitted evidence that it normally pays for the specialized tooling needed to manufacture M16 parts and that M16 parts are but a relatively small portion of the business of these suppliers. (*See* supplemental affidavit of Stillwell at ¶¶ 3, 4). Because Colt's evidence undermines the assumption made by Professor Harrison and Christianson has submitted no evidence in response, this Court must conclude that Christianson has failed to establish that there is a material issue of fact regarding whether Colt had monopsony power. Thus, this Court grants partial summary judgment for Colt on Christianson's monopsony power claim.

E. *Has Christianson Made a Sufficient Showing that Colt's Actions had an Anticompetitive Effect in the Relevant Market?*

■ As an essential element of a Sherman Act claim under either § 1 or § 2, the Plaintiff must prove anticompetitive effect in the relevant market—injury to the market as well as to the Plaintiff himself. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109–1110 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1984); *Kling v. St. Paul Fire and Marine Ins. Co.*, 626 F.Supp. 1285, 1291 (C.D.Ill.1986). Because the antitrust laws are designed to protect competition, not competitors, a loss of business by the Plaintiff is insufficient to support a Sherman Act claim unless accompanied by generalized injury to the market. *Collins v. Associated Pathologists, Ltd.*, 676 F.Supp. at 1399–1400 (C.D.Ill.1987) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), *aff'd*, 844 F.2d 473 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *see also, Contractor Utility Sales Co. v. Certain–Teed Products Corp.*, 638 F.2d 1061, 1078 n. 21 (7th Cir.1981) ("the losers [in the marketplace] must prove more than their loss in order to secure relief under the antitrust laws."). As this Court stated in *Kling*, 626 F.Supp.

at 1292, the harm must be to competition within the marketplace and not just to the plaintiffs.

■ This Court concludes that Christianson has created a genuine issue of material fact regarding whether or not there has been harm to the replacement parts market with foreign governments who use the M16 as their standardized rifle. This conclusion is supported by the same evidence which Christianson presented to create an issue of material fact regarding whether or not Colt had monopoly power in this particular market. This evidence includes: Christianson's affidavit which states that representatives of the Philippines and Singapore told him his prices were cheaper than Colt's (*see* Plaintiff's Exhibit 7, Christianson's affidavit at ¶ 17); the undisputed facts about Colt's licensing agreements with its suppliers, the United States, and foreign governments; the fact that Colt and several foreign governments, including the Philippines, Singapore, and Korea, have had lawsuits or disputes over their licensing agreements with Colt; and the affidavit of Professor Harrison which asserts that Colt may have monopoly power over the market because of its licensing agreements (*see* Plaintiff's Exhibit 17). (*See also* earlier discussion of monopoly power in this Court's opinion on pages 35–37).

F. *Are Trade Secrets Which are Protected by the Common Law a Sufficient Legal Justification for Restraining Competition Under the Antitrust Laws?*

■ Colt asserts that actions which were taken in good faith to enforce trade secrets do not violate the antitrust laws. Colt notes that in *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986), the First Circuit stated the following rule for cases in which an antitrust claim is based on the defendant's conduct in asserting trade secrets:

We believe that the proper balance between the antitrust laws and trade secrets law is achieved by requiring an

antitrust *plaintiff to prove, in addition to the other elements of an antitrust violation, by clear and convincing evidence, that the defendant asserted trade secrets with the knowledge that no trade secrets existed.*

769 F.2d at 851 (emphasis added). In a somewhat similar context, the Ninth Circuit stated:

The critical question in an antitrust context is whether the restriction may be said to be ancillary to a commercially supportable licensing arrangement, *or whether the licensing scheme is a sham set up for the purpose of controlling competition while avoiding the consequences of the antitrust laws.*

*A & E Plastik Pak Co. v. Monsanto,* 396 F.2d 710, 715 (9th Cir.1968) (emphasis added).

Christianson argues that Colt should have the burden to prove that its trade secrets were valid just as it would if Colt attempted to enforce its trade secrets under state law. *See, Televation Telecommunications v. Saindon,* 119 Ill.Dec. 500, 503, 522 N.E.2d 1359, 1362, 169 Ill.App.3d 8 (1988). Christianson asserts trade secrets cannot be used to unreasonably restrain competition. He notes that the court in *Home Box Office, Inc. v. FCC,* 587 F.2d 1248, 1253 (D.C.Cir.1978) stated:

Although the antitrust laws prohibit the use of exclusivity contracts as a means of unreasonably restraining competition, *they permit the creation and transfer of exclusive rights that reasonably serve to maintain or enhance the value of an artistic or intellectual product.* (Emphasis added).

However, from the *Raytheon* and the *Monsanto* case, it is clear that the Plaintiff has the burden to prove that the claim of protected trade secrets is a sham or that the Defendant asserted its trade secrets with the knowledge that no trade secrets existed. Further, the *Home Box Office* case did not address the question of which party should have the burden of proving that the assertion of intellectual property rights unreasonably restrained competition.

Since Christianson has not attempted to prove that Colt's assertion that it had protected trade secrets was a sham and since Christianson has not shown by clear and convincing evidence that Colt asserted that trade secrets existed with the knowledge that no trade secrets existed, this Court concludes that Colt's assertion of protected trade secrets under its licensing arrangement is a sufficient legal justification for its actions which were reasonably necessary to enforce Colt's trade secrets.

However, this does not mean that Colt's actions in asserting its economic power to enforce its trade secrets were automatically justified or that Colt could not have waived the assertion of its trade secrets with regard to Christianson. In *Monsanto* and *Raytheon,* the defendants attempted to enforce certain trade restraints by asserting their legal rights rather than by threatening to discontinue business relationships. These cases do not address the questions which exist in this case regarding whether the assertion of trade secrets by improper means can be unlawful or whether waiver of the enforcement of trade secrets can make the attempt to enforce these rights an unreasonable restraint of trade. There are still genuine issues of material fact which must be resolved on these points. (*See* earlier discussion on the Permission Letter on pages 20–25 and the discussion of the *Noerr–Pennington* doctrine at pages 25–30).

 Christianson next asserts that the Court should hold that state patent trade secret law cannot be used to perpetuate a commercial monopoly previously protected by a patent as otherwise patentees are provided with a mechanism for maintaining a monopoly over their product in perpetuity by asserting trade secret claims in crucial and duplicable technology. *See, Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989).

In *Bonito,* a Florida statute prohibited the use of a direct molding process which was used as a form of reverse engineering to duplicate unpatented boat hulls. *Id.* 109 S.Ct. at 974. The Supreme Court held that,

by offering patent-like protection[4] for ideas deemed unprotected under the federal patent scheme, the Florida statute conflicted with the strong federal policy in the patent laws which favors free competition in ideas which do not merit patent protection. *Id.* at 981–982.

Christianson maintains in this case that it is nearly impossible to reverse engineer Colt's trade secrets. The *Bonito* case is distinguishable from this case because, as the Supreme Court noted, the Florida statute granted the original manufacturer the right to prohibit a form of reverse engineering in a product in general circulation. *Id.* at 982. The Court found that this is one of the rights granted to a federal patent holder but which has never been part of state protection under the laws of unfair competition or trade secrets. *Id.* As the *Bonito* court commented, the laws of unfair competition and state trade secret law have co-existed harmoniously with federal patent protection for 200 years, *Id.* at 985–986. Therefore, *Bonito* does not allow this Court to strike down Colt's trade secrets simply because they are difficult to reverse engineer.

## II. CHRISTIANSON'S TORTIOUS INTERFERENCE CLAIM

*Has Christianson Stated a Claim Under Illinois Law for Tortious Interference with Contractual Relations?*

The proper standards in Illinois for what must be proved in order to recover on a claim for tortious interference with respect to a business relationship or expectancy is found in *O'Brien v. State Street Bank and Trust Co.*, 82 Ill.App.3d 83, 37 Ill.Dec. 263, 264–265, 401 N.E.2d 1356, 1357–1358 (4th Dist.1980); *see also, Belden Corp. v. Internorth, Inc.*, 90 Ill.App.3d 547, 45 Ill.Dec. 765, 768, 413 N.E.2d 98, 101 (1st Dist.1980). The Court in *O'Brien* stated:

The elements which establish a prima facie tortious interference are the existence of a valid business relationship (not necessarily evidence by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. The interest protected is the reasonable expectation of economic advantage.

*O'Brien*, 37 Ill.Dec. at 264–265, 401 N.E.2d at 1357–1358.

Colt does not dispute that all of the elements of a prima facie case given in *O'Brien* and *Belden* exist in this case. However, Colt correctly contends that the Plaintiff must not only show that the Defendant's conduct was intentional but that its conduct was *unjustified* in inducing the breach of contract. *See, HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 137 Ill.Dec. 19, 23, 545 N.E.2d 672, 676, 131 Ill.2d 145 (1989); *see also, Mittelman v. Witous*, 142 Ill.Dec. 232, 246–247, 552 N.E.2d 973, 987–988, 135 Ill.2d 220 (1990); *Disher v. Fulgoni*, 112 Ill.Dec. 949, 964, 514 N.E.2d 767, 782, 161 Ill.App.3d 1 (1st Dist.1987); *R.J.N. Corp. v. Connelly Food Products, Inc.*, 125 Ill.Dec. 108, 114, 529 N.E.2d 1184, 1190, 175 Ill.App.3d 655 (1st Dist.1988); *Swager v. Couri*, 32 Ill. Dec. 540, 545–548, 395 N.E.2d 921, 926–929, 77 Ill.2d 173 (1979); *Arlington Heights National Bank v. Arlington Heights Federal Savings and Loan Association*, 37 Ill.2d 546, 552, 229 N.E.2d 514, 518 (1967); *King v. Levin*, 132 Ill.Dec. 752, 758, 540 N.E.2d 492, 498, 184 Ill.App.3d 557 (1st Dist.1989) (directed verdict for the defendant where the plaintiff failed to show that defendant acted with a desire to harm which is independent of and unrelated to a desire to protect its rights and is not reasonably related to the defense of a recognized property or social interest).

However, Christianson does not have to prove that Colt's actions were *unjustified* until Colt can show that it has a *privilege*.

---

4. Federal patent law prohibits the reverse engineering of a product while state trade secret law allows reverse engineering.

In the *Mt. Vernon Hospital* case, the Illinois Supreme Court stated:

> In Illinois, this court has repeatedly stated that where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious. (Citations omitted) ... *Therefore, before we can determine who has the burden of pleading justification (or a lack thereof), we must first decide whether the defendant's conduct here was protected by a privilege.*

*Mt. Vernon Hospital,* 137 Ill.Dec. at 24, 545 N.E.2d at 677 (emphasis added).

The court further stated in the *Mt. Vernon Hospital* case that:

> Courts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect *an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights.* (Citations omitted).

*Id.* at 24, 545 N.E.2d at 677 (emphasis added).

One of the cases cited by the Illinois Supreme Court in *Mt. Vernon* stated the test for determining when a privilege exists in more detail. The court stated:

> The law recognizes that in many cases a third party may be privileged to purposely bring about a breach of plaintiff's contract with another. The third party is so "privileged" when he is acting to protect a conflict interest that is considered under the law to be of a value equal to or greater than the plaintiff's contractual rights, *provided, however, that the third party's acts to bring about the breach must be legal acts and must not be unreasonable in the circumstances.* (Citations omitted). Restatement (Second) of Torts sec. 767 91979); W. Prosser, Torts sec. 129, at 936–37 (4th ed. 1971). *Certified Mechanical Contractors v. Wight & Co.,* 113 Ill.Dec. 888, 894, 515 N.E.2d 1047, 1053, 162 Ill.App.3d 391 (2nd Dist.Ill.1987).

■ This Court has no doubt that the law recognizes that the protection of a defendant's trade secrets has greater or equal value to a plaintiff's contractual rights. However, if Christianson can show that Colt's actions were illegal or unreasonable, then Christianson does not have to plead and prove Colt's acts were unjustified.

■ An opinion by the Seventh Circuit in *Independence Tube Corp. v. Copperweld Corp.,* 691 F.2d 310, 324 (7th Cir. 1982), *rev'd on other grounds,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) supports the above position. In that case, the court quoted the relevant portion of the Restatement Second of Torts, § 733, which defines the scope of a privilege. *Independence Tube,* 691 F.2d at 323. It states:

> One who by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest *by appropriate means,* intentionally causes a person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Id.* at 323–324 (emphasis added).

The Seventh Circuit then stated:

> Under this version the legally protected interest must exist at least in the abstract, the assertion of it or threat to enforce it must be in good faith, *the means chosen must be appropriate,* and the claimant must believe that the contract or transaction, if allowed to go forward, would impair or destroy that right.

*Id.* at 324 (emphasis added).

Again, the Restatement Second of Torts quoted by the Seventh Circuit indicates that the means chosen to enforce a claimed privilege must be appropriate for the privilege to exist. If Colt threatened to discontinue business with Christianson's suppliers in order to assert its economic power rather than threatening legal action to enforce its trade secrets, this Court believes that there is at least a question of fact regarding whether or not its actions were

unreasonable under the circumstances. This is particularly true where there are questions of fact regarding whether Colt waived or is estopped to assert its trade secrets as a defense against Christianson.

Even assuming that Colt has established a privilege in this case, this Court believes that Christianson has offered sufficient proof that Colt's manner of enforcement of trade secrets lacked justification to create an issue of material fact. Illinois courts have stated:

> Just cause for their interference depends upon a number of factors, including the interest that they sought to protect through their actions, *and the methods which they employed to protect their interest. (Citation omitted). The method which they used, the letter of Nielsen, which resulted in interference with Disher's interest would have had to have been legal and not unreasonable under the circumstances.* (Citation omitted).

*Disher*, 112 Ill.Dec. at 964, 514 N.E.2d at 782.

Christianson has presented evidence suggesting that it was inappropriate for Colt to threaten the termination of its business relations with its suppliers rather than threatening legal action, and Christianson has presented evidence suggesting that it was unreasonable for Colt to take these actions in light of Colt's actions in issuing the permission letter to Christianson and allowing Christianson to continue production.

## CONCLUSION

In accordance with the foregoing, the Court grants Colt's Motion for Summary Judgment in part and denies it in part. The Clerk of the Court is directed to set this matter for Final Pre–Trial.